### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KAREN BROOKINS individually and** | **:** | **CIVIL ACTION** |
| **as Administratix of the Estate of Marcus** | **:** | |
| **Richard Boone** | **:** | |
| | **:** | |
| **v.** | **:** | **NO.  24-470** |
| | **:** | |
| **THE CITY OF PHILADELPHIA, P.O.** | **:** | |
| **CHRISTOPHER CULVER, DET.** | **:** | |
| **WALSH, and CAPT. LUCA** | **:** | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                    **December 10, 2024**

Karen Brookins's adult son Marcus Boone had long suffered with mental illness and drug addiction when he walked onto the ledge of a highway overpass one morning in March 2022 declaring he wanted to end his life. Philadelphia Police officers talked with Mr. Boone for almost three hours. They eventually persuaded him to walk to the end of the overpass hoping he would sit down with them and discuss his concerns. He never sat down. Mr. Boone instead dove headfirst onto the side of the road below him. He passed away at the hospital a few hours later. One officer inexcusably used his cell phone to take a picture of Mr. Boone suffering on the ground. He then broadcasted his recklessness by immediately circulating this photo to friends.

Karen Brookins began asking questions the next day about her son's last hours. The police allegedly claimed they did not have body camera footage. Ms. Brookins continued asking around. Someone sent Ms. Brookins the photograph of her son over Facebook nine days after his passing. She saw the photo again when she visited a gas station near the overpass. Ms. Brookins first sued the officer and the City for violating her privacy rights through the photograph and then amended (after the statute of limitations expired) challenging the officers' conduct (and the City's policies) she claims led to her son's decision after she finally obtained the bodycam footage.

We allow Ms. Brookins to proceed on her otherwise untimely claim challenging the officers' conduct on the overpass finding fact questions about the officers' fraudulent concealment of the body camera footage. But, viewed in the context of two-and-a-half hours of bodycam footage, there are no genuine issues of material fact precluding our finding three or four statements by officers on the overpass allegedly within Mr. Boone's hearing did not cause him to harm himself. We are disturbed by the officer's reprehensible decision to take and then circulate a picture of the fatally injured Mr. Boone. But this officer could not have known his now-admitted reckless lapse in judgment would violate Ms. Brookins's privacy rights. He is entitled to judicially created qualified immunity from constitutional scrutiny. Ms. Brookins also did not adduce evidence allowing us to find the officer's singularly reckless act arose from the City's deficient training. And Ms. Brookins cannot proceed on her state law emotional distress claim against the photographing officer because she cites no evidence establishing his circulation of the photograph caused her emotional distress. We grant the City and its officers' motions for summary judgment.

## I. Undisputed material facts

Karen Brookins's adult son Marcus Boone resided at some point at the Gaudenzia Diagnostic Rehabilitation Center in Philadelphia for treatment of drug addiction and mental health issues.[1] Mr. Boone attempted to take his own life on at least six occasions before March 2022.[2]

Mr. Boone climbed onto the outer ledge of an overpass where Knights Road crosses over Woodhaven Road in the Greater Northeast section of Philadelphia on a chilly March 18, 2022 morning in the area shown in the green and blue highlighted sections below.[3]




He walked to the middle of the overpass directly above Woodhaven Road below and stood on the outside of a fence separating him from the overpass on Knights Road:[4]



***Police officers talk to Mr. Boone for two and a half hours, eventually persuading him to come away from the middle of the overpass.***

The Philadelphia Police Department sent twenty to thirty officers to the scene to talk to Mr. Boone and control traffic and bystanders.[5] Some of the officers worked with the Counterterrorism

Unit and others worked as crisis negotiators.[6] Police Officer Christopher Culver, a member of the Counterterrorism Unit, arrived on the scene to assist with traffic control and stood approximately thirty yards away from the negotiations on the overpass.[7]

Detective Walsh arrived at the scene to gather information.[8] He did not communicate directly with Mr. Boone.[9] Inspector (then Captain Luca), one of the officers primarily responsible for negotiating with or speaking to Mr. Boone, interacted with Mr. Boone for almost the entire three hours.[10] Detective Rovnan also negotiated with Mr. Boone for most of the time and eventually took the lead as Mr. Boone seemed to respond to him.[11] Police officer Paul Andrews, another officer with crisis training, captured footage of the incident with a body camera.[12] His body camera captured over two hours of the encounter between five to ten officers and Mr. Boone as they tried to persuade him to come down from the ledge either by walking onto Knights Road or coming down a firetruck ladder.[13]

The officers did not know Mr. Boone and tried to find out his identity.[14] They mistakenly identified him as "Albert" and thought he used "Marcus Boone" as an alias.[15] Mr. Boone eventually told the officers his name, his birthday, and his mother's name.[16] Mr. Boone said his mother was dead at one point and then later asked for her and said he saw her along the adjacent streets.[17] He did not ask to speak to anyone besides his mother.[18] He claimed to see some of his family members several hundreds of yards away on the streets, calling for him.[19] He told the officers he had mental problems.[20] Mr. Boone screamed many times he wanted the media present.[21] He claimed the police worked with organized crime families and wanted to kill him and/or members of his family.[22] He claimed police held children hostage.[23] He claimed police intended to blow up the overpass.[24] He screamed another country had taken over America.[25] He repeatedly threatened to jump off the overpass and told the officers he was not afraid to die.[26] He screamed "shoot me bitch" three times

to a female officer not near the body camera.[27] He acted suspicious of new officers approaching him, so the officers designated certain persons like Detective Rovnan to speak to him.[28] He told the officers the nature of our society caused him to have a terrible day.[29] He said he had not taken his medicine which helped calm him down so he did not hear voices.[30] He took off his shirt on a chilly March day and urinated through the fence onto the Knights Road overpass.[31]

The officers interacting with Mr. Boone frequently told him no one wanted him to die, they were not going to hurt him, and they had resources to help him.[32] They told him he was not in trouble.[33] When Mr. Boone stated he had mental problems, Inspector Luca responded, "it's fine. There ain't nobody on this earth that doesn't have mental health problems. Everybody has them . . . all four of us up here have issues."[34] Mr. Boone intermittently responded to the officers in a manic fashion and lapsed into long periods of silence.[35] Conversations picked up on the bodycam confirmed the officers' plan to engage Mr. Boone by talking to him about his life and their lives.[36] They spoke to Mr. Boone about a Philadelphia Flyers trade the night before, nicknames, favorite hobbies, a relationship to Philadelphia Phillies legendary catcher Bob Boone, and tattoos (including whether one of the tattoos on Mr. Boone's naked torso depicted his child's name), while attempting to wait out what they believed to be a high from some type of narcotic.[37]

### *Unidentified officers are less tolerant after some time.*

Some of the officers tried a different tactic after a while. They told Mr. Boone to stop being silly and told him they could not help other people in need while he remained on the bridge.[38] About forty-five minutes before he jumped, Mr. Boone told the officers he felt nervous, and, a minute later, asked "if it's gonna turn into a good day, why is it so hostile?"[39] Around this time Officer Andrews expressed doubts to Detective Rovnan about "the pressure they are putting on him" and stated, "it's just making things a little bit worse."[40] He also described the officers' tactics

5

as "a little bit too forceful."[41] The bodycam confirms some officers used inappropriate references but Mr. Boone did not respond other than largely ignore them.[42]

Some of the officers had side conversations caught on camera while Mr. Boone stood on the ledge.[43] They talked about Mr. Boone and other things.[44] After Officer Andrews had been recording for about two hours, Detective Walsh—whose responsibility was to gather information—approached Officer Andrews and a couple of other officers.[45] The officers discussed whether anyone had contacted Mr. Boone's wife or mother.[46] Detective Walsh said they had tried a number (it is unclear whose number they tried), but no one answered.[47] Detective Walsh then said to the officers—but not to Mr. Boone—"We did talk to the therapist . . . from that Gaudenzia House, and she said she had to go [somewhere indistinguishable] . . . apparently he had a cocaine addiction problem."[48]

A few minutes after Detective Walsh's remarks about contacting Gaudenzia House, Officer Andrews commented the officer negotiating with Mr. Boone seemed to be agitating him and asked whether they should switch out.[49] Detective Rovnan responded some of the officers who had been sent to the scene lacked training, but he did not name a specific officer nor whether the officers talking to Mr. Boone lacked training.[50]

### *Mr. Boone eventually walks to the end of the ledge without fencing before harming himself.*

Detective Rovnan tried to get Mr. Boone to walk to the end of the ledge to get him off the overpass.[51] Mr. Boone asked Detective Rovnan for a Mountain Dew and a cigarette.[52] Detective Rovnan repeatedly told Mr. Boone he would get him the soda and cigarette, but Mr. Boone would need to walk to the end of the ledge (the part without a fence) to have a sit-down and talk things out.[53] Mr. Boone did not like this plan and refused to move, but promised to sit down with Detective Rovnan on the side ledge if he could drink a Mountain Dew and have a cigarette.[54]

Detective Rovnan told Mr. Boone he would trust his word and handed a Mountain Dew to him over the fence.[55] The officers arranged for an on-site fire truck ladder for Mr. Boone to come down.[56] They also planned (as confirmed on the body cam) to get Mr. Boone to walk to the end of the ledge, where the safety fencing stopped, to get him off the overpass.[57]

Mr. Boone's tone and willingness to safely come off the ledge fluctuated. At certain points, as reflected in the footage, every sign suggested Mr. Boone calmed down and would soon sit down and talk to the officers on the ledge about getting help. For instance, the softer conversational negotiation style of Detective Rovnan worked initially, and he succeeded in getting Mr. Boone to walk to the end of the ledge.[58] The officers asked and Mr. Boone confirmed he had a knife with him.[59] Mr. Boone agreed to give Detective Rovnan the blade so he could sit down with the officers on the ledge without threatening their safety.[60] He then handed the blade to Detective Rovnan.[61] Mr. Boone reached the non-fenced portion of the ledge and turned around and faced the negotiating officers on Knights Road.[62] He spoke to them from the non-fenced ledge but would not sit down on the ledge and talk to the officers.[63]



The officers decided to not grab Mr. Boone while he stood on the cement ledge for fear he would fall.[64] They decided to wait him out until they thought they could safely grab him or he

decided to sit down.[65] Detective Rovnan told all the officers to back off and the officers backed off several feet to give Mr. Boone time to sit down on the ledge.[66]

We then hear the officers' side conversations, and it does not appear (nor is there evidence) Mr. Boone heard them. Detective Rovnan complained about being on the job and discussed car detailing with Officer Andrews at least twenty feet away from where Mr. Boone stood on the ledge.[67] Detective Walsh, who had walked a few feet away, re-approached Officer Andrews and Detective Rovnan.[68] Someone asked Detective Walsh, "how you doing?" to which he responded in a barely audible voice, "I'm enjoying this."[69] Detective Walsh and the other officers then discussed house remodeling.[70]

Mr. Boone stood facing the officers on Knights Road while Detective Walsh and the others had this side conversation.[71] The officers continued to wait for Mr. Boone to sit down since they did not want to tackle or grab him while on the ledge.[72] Mr. Boone seemingly became agitated again while standing on the cement ledge.[73] The officers moved closer to the ledge at this point but still stood about fifteen feet away from where Mr. Boone stood.[74] Mr. Boone turned back around to face the shoulder of Woodhaven Road below him.[75] Detective Rovnan said, "Marcus, no! . . . I know it's tough . . . Life's worth it . . . what's it going to take for you to come down for me?"[76] Mr. Boone responded, "I just want to die."[77] Officer Andrews and Detective Rovnan again discussed trying to grab Mr. Boone ("We're going to have to snatch him, I know it.").[78] Mr. Boone then dove headfirst from the ledge on the overpass onto the Woodhaven Road shoulder area below.[79]

The officers and emergency personnel moved into action; they immediately commented Mr. Boone survived his jump from the Knights Road overpass, but he sustained severe injuries.[80] At least one officer remarked he appeared to be alive.[81]

***Officer Culver uses his cell phone to photograph the injured Mr. Boone and then***
***circulate the photo to off-site coworkers.***

Counterterrorism Officer Culver (not involved in negotiations) leaned over the overpass

and took a photograph of Mr. Boone laying alongside Woodhaven Road.[82] He sent the photograph

to nine officers in his unit at 11:47 a.m.[83] Someone posted the photograph on the crime-reporting

app Citizens' App.[84] Ms. Brookins apparently never discovered who posted the reckless

photograph online.

***Ms. Brookins tries to find out what happened to her son.***

Ms. Brookins did not make it to the ledge as she was on her way to see her incarcerated

husband at State Correctional Institution Phoenix in Montgomery County.[85] She learned her son

might be the person on the overpass when her niece sent her a text message and a photograph of

the situation.[86] She later learned on-site emergency personnel had taken her son to the hospital.[87]

She went to the hospital to see her son.[88] Doctors told her Mr. Boone had catastrophic injuries, but

they were still working on him.[89] Mr. Boone passed away in the hospital at 2:15 p.m.[90]

Ms. Brookins went to work to find out what happened beginning the next day. She spoke

to people from the Police Department, including Detective Walsh and Lieutenant Seamen, seeking

body camera footage and other information.[91] She spoke with Detective Walsh on March 19,

2022.[92] She spoke with Lieutenant Seamen on April 28, 2022.[93] She also spoke with other

unidentified persons from the Police Department.[94]

Ms. Brookins saw the photograph Officer Culver had taken of her son when a woman sent

her a Facebook message on March 27, 2022.[95] Ms. Brookins visited the Sunoco gas station about

ten days later in April 2022 near the overpass at Knights and Woodhaven Roads to see if anyone

there knew anything about the incident.[96] She spoke with a gas station attendant, who told her

about, and then sent her, the same photograph of Mr. Boone.[97] Ms. Brookins also spoke with other

people who had seen Mr. Boone on the overpass.[98] These people told her they noticed the police seemed to be arguing with Mr. Boone but they also indicated the officers almost succeeded in getting Mr. Boone off the ledge.[99]

Ms. Brookins sued the City of Philadelphia and a John Doe Defendant over the dissemination of the photograph of Mr. Boone on January 31, 2024.[100] She did not plead and did not know who took or circulated the photograph. The Police Department's Internal Affairs Division began investigating the photograph incident after learning of this case.[101] The Philadelphia Police Department distributes a directive about responding to severely mentally disabled persons and a crime scene responsibility directive.[102] The crime scene responsibility directive prohibits the use of personal cell phones at crime scenes except in exigent circumstances.[103] The Police Department determined Officer Culver took the photo and sent it to others.[104] Ms. Brookins learned body camera footage existed in April 2024.[105]

Ms. Brookins moved to amend to add constitutional and state law claims against the City and several individual police officers relating to the interactions on the overpass after viewing the body cam footage. She later dismissed a number of officers and claims.[106] She prepared for trial on her remaining claims: a Fourteenth Amendment privacy interest claim against Officer Culver for taking and disseminating the photograph; a municipal liability claim against the City for failing to train police officers about privacy rights; an intentional infliction of emotional distress claim against Officer Culver; a Fourteenth Amendment state-created danger claim against Detective Walsh and Inspector Luca and a derivative wrongful death claim; and a municipal liability claim against the City for failing to train officers how to deal with individuals undergoing mental health crises.

## II.    Analysis

The City, Detective Walsh, and Inspector Luca move for summary judgment. Officer Culver separately moves for summary judgment. We grant summary judgment in favor of the Defendants on all claims. [107]

### A.  We grant summary judgment in favor of Officer Culver on Ms. Brookins's privacy interest claim.

Officer Culver moves for summary judgment on Ms. Brookins's substantive due process claim Officer Culver violated her constitutional right to privacy.  We do not agree Officer Culver's various arguments preclude finding Ms. Brookins enjoys a privacy right. Ms. Brookins has a constitutional privacy interest in the photograph of her son. But we are the first court in this Circuit to reach this conclusion. The lack of clear guidance in March 2022 entitles Officer Culver to qualified immunity notwithstanding his reprehensible conduct. And Ms. Brookins does not argue the wrongfulness of Officer Culver's conduct was so obvious any police officer would know taking the photograph violated federal law. We must find a parent's right to control death images of the deceased from public exploitation is not clearly established. Officer Culver avoids personal liability for his conscious-shocking conduct under the doctrine of qualified immunity.

"The Fourteenth Amendment right to privacy shields individuals 'from unwarranted governmental intrusions into their personal lives.'"[108] "The United States Constitution does not mention an explicit right to privacy and the United States Supreme Court has never proclaimed that such a generalized right exists."[109] But the Supreme Court "has found certain constitutional 'zones of privacy.'"[110]  "Traditionally, the Fourteenth Amendment has protected two categories of privacy rights."[111] Relevant here is "the individual interest in avoiding disclosure of personal matters."[112] "The touchstone of constitutional privacy protection is whether the information at issue is 'within an individual's reasonable expectations of confidentiality.'"[113] "The more intimate

or personal the information, the more reasonable the expectation is that it will remain confidential."[114] "[T]he constitutional right of privacy . . . shields from public scrutiny only that information which involves 'deeply rooted notions of fundamental personal interests derived from the Constitution.'"[115]

The Court of Appeals for the Ninth Circuit in *Marsh v. County of San Diego* recognized as a matter of first impression twelve years ago "the publication of death images interferes with 'the individual interest in avoiding disclosure of personal matters . . . .'"[116] In *Marsh*, a district attorney copied autopsy photographs of a child whose murder he prosecuted.[117] The district attorney sent one of the photographs to a newspaper and television station years after the autopsy with a memorandum he wrote entitled "What Really Happened to Phillip Buell?"[118] The child's mother sued San Diego County alleging the copying and dissemination of her child's autopsy photographs violated her Fourteenth Amendment due process rights.[119] The Court of Appeals for the Ninth Circuit explained "[t]o violate substantive due process, the alleged conduct must 'shock[] the conscience' and 'offend the community's sense of fair play and decency.'"[120] The court held Ms. Marsh had a substantive due process right to control the body and death images of her son; the public disclosure of the photographs violated that right.[121]

The Court of Appeals for the Ninth Circuit relied on the Supreme Court's decision in *National Archives and Records Administration v. Favish*.[122] The Supreme Court in *Favish* held family members have a privacy right to death images under an exemption to the Freedom of Information Act.[123] The Court explained case law and cultural traditions establish a right of privacy in death images rooted in the common law.[124] The court of appeals in *Marsh* took it one step further and concluded "the common law right to non-interference with a family's remembrance of a decedent is so ingrained in our traditions that it is ***constitutionally*** protected."[125]

Officer Culver argues he is entitled to summary judgment because Ms. Brookins does not have a constitutional privacy right in the photograph of her son. Officer Culver attempts to distinguish the circumstances surrounding Mr. Boone's death with the autopsy photographs circulated years later in *Marsh*. Officer Culver also claims qualified immunity protects him even if he did violate Ms. Brookins's privacy rights.[126] We address each argument in turn.

### 1. Ms. Brookins has a privacy interest in the photograph of her son's body.

Officer Culver argues the constitutional privacy interest is limited to fact information concerning oneself.[127] He attempts to distinguish Ms. Brookins's claimed privacy interest from several decisions by our Court of Appeals delineating the types of personal information protected by the constitution.[128] Ms. Brookins responds with a trial court opinion from thirty-four years ago finding the Constitution protects family members from disclosure of their relatives' AIDS status.[129]

We rejected the argument the photograph of Mr. Boone does not implicate Ms. Brookins's right to privacy when we denied the City's motion to dismiss.[130] We allowed Ms. Brookins's claim to proceed into discovery on the novel (in this Circuit) substantive due process right recognized in *Marsh*—the constitutional right to non-interference with a family's remembrance of a decedent.[131] We need not address this issue again. We instead turn to Officer Culver's attempts to avoid this finding based on fact distinctions.

### 2. Mr. Boone's vital status at the time of the photograph is not dispositive.

Officer Culver argues we are reviewing a different fact pattern than *Marsh* because the child in *Marsh* was dead when photographed but Mr. Boone was alive.[132] Ms. Brookins responds by citing cases finding a privacy right (although not under the Constitution) in pre-death recordings.[133] Officer Culver presumes the case involves a photograph of a deceased Mr. Boone.

But his argument faces a procedural problem. The pleadings filed under Federal Rule of Civil Procedure 11 repeatedly represented Officer Culver took a picture of a deceased Mr. Boone. We cannot imagine how Ms. Brookins or the City's officers could allow this misrepresentation; Ms. Brookins knew her son lived for a few hours after his self-harm and the officers knew he survived within seconds of viewing Mr. Boone on the ground. The lawyers at summary judgment finally seem to have learned what their clients knew all along: all parties now acknowledge Officer Culver took the photo of a living Mr. Boone alongside Woodhaven Road within minutes of his self-harm. These allegations are utterly distinct from the facts of Ms. Brookins's first three complaints swearing Mr. Boone was dead when Officer Culver took the photograph.[134] We granted Ms. Brookins leave to amend her Complaint to challenge the officers' conduct on the overpass but we plainly instructed her not to adduce facts changing Mr. Boone's vital status.[135] She did so anyway.[136] Officer Culver now adopts this version of events.[137] The situation facing us—the parties all arguing facts totally distinct from the facts initially sworn under Rule 11—presents a procedural conundrum the likes of which a first-year law student would shudder to see on a Federal Civil Procedure exam. Yet we need not address this issue at length other than to note it raises questions about the attorneys' diligence and candor to the Court. But we save this ethical question for another day as we find Ms. Brookins has a Fourteenth Amendment privacy right regardless of which version of the facts applies.

The constitutional right the Court of Appeals for the Ninth Circuit identified in *Marsh* is the "right to non-interference with a family's remembrance of a decedent[.]"[138] True, the state actor in *Marsh* photographed a dead child. But the court's reasoning for finding a constitutional violation applies equally here. The court of appeals found "the long-standing tradition of respecting family members' privacy in death images partakes of both types of privacy interests protected by the

Fourteenth Amendment.  . . . Few things are more personal than the graphic details of a close family member's tragic death. Images of the body usually reveal a great deal about the manner of death and the decedent's suffering during his final moments—all matters of private grief not generally shared with the world at large."[139]

The court of appeals's well-reasoned analysis in *Marsh* applies to the photograph of Mr. Boone notwithstanding the newly posited fact he did not succumb to his injuries until hours later. Officer Culver's cell phone photograph captures graphic details of Mr. Boone's appearance on the ground. The cell phone photograph reveals a great deal about how he died and his suffering in his final moments. Ms. Brookins swore: "In that photograph [her son] looked like he was tortured, like grimace, like, you know, uncomfortable, hurting, alone. . . . [T]he photograph just kind of really gave me this uglier picture of what I already . . . was experiencing."[140] Like in *Marsh*, someone shared this depiction of Mr. Boone's fatal injuries with the world at large after Officer Culver inexcusably shared the photograph with his fellow officers and it ended up online.

The newly posited (but long known) fact Mr. Boone did not die until after Officer Culver photographed him does not warrant summary judgment in favor of Officer Culver.

### 3. Mr. Boone's location before and at the time of the photograph does not impact Ms. Brookins's privacy rights.

Officer Culver further attempts to distinguish the court of appeals's reasoning in *Marsh* by pointing out Mr. Boone's injuries and final moments "occurred on a public thoroughfare in the middle of the day" while the child in *Marsh* died in his home.[141] He argues the circumstances of Mr. Boone's final moments "were already on public display[,]" while the autopsy photo in *Marsh* revealed private information.[142] Officer Culver borrows this public-versus-private dichotomy from Fourth Amendment jurisprudence.[143] Ms. Brookins responds it is immaterial the injuries to Mr.

Boone happened on a public road, particularly because the police established a perimeter around the scene.[144]

We assess the right to privacy through a two-step test.[145] We first assess whether "whether [the information] is within an individual's reasonable expectations of confidentiality."[146] We then "balance the privacy interest against the public or governmental interest in disclosure."[147] The analysis is "fact-intensive and context-specific . . . unfortunately, bright lines generally cannot be drawn."[148]

### i.    Ms. Brookins enjoyed a reasonable expectation of privacy.

We start with the reasonable expectation of privacy. Constitutional privacy protection turns on whether an individual has a reasonable expectation of confidentiality in the information.[149] An individual may reasonably expect highly intimate or personal information to remain confidential.[150]

Relying on a quote from our Court of Appeals in *Doe v. Luzerne County*, Officer Culver argues the Fourth Amendment's guarantee of a legitimate expectation of privacy informs Ms. Brookins's expectation of confidentiality.[151] But our Court of Appeals in *Luzerne* found the Court of Appeals for the ***Sixth Circuit*** locates the right to privacy in the Fourth Amendment; ***our*** Court of Appeals locates the right to privacy in the Fourteenth Amendment.[152] Our Court of Appeals did acknowledge "the contours of the right appear to be the same[]" under both amendments.[153] But Officer Culver takes this a step too far by assuming Fourth Amendment search and seizure case law applies to substantive due process privacy cases. Although both types of cases require a reasonable expectation of privacy, "[t]he fundamental task of any Fourth Amendment analysis is assessing the reasonableness of [a] government ***search***."[154] By contrast, the Fourteenth Amendment shields intimate or highly personal information from public disclosure.[155]

The Fourth Amendment cases Officer Culver references do not help our analysis. The Supreme Court's analysis in *California v. Ciraolo* and *Oliver v. United States* both involved a search and seizure of marijuana plants being grown on an individual's property.[156] Our Court of Appeals's analysis in *In re Grand Jury Proceedings (Mills)* involved a grand jury's demand a witness submit to hair sampling.[157] The Supreme Court in *Ciraolo* held the Fourth Amendment does not "require law enforcement officers to shield their eyes when passing by a home on public thoroughfares[]" or "preclude an officer's observations from a public vantage point where he has a right to be . . . ."[158] The Supreme Court in *Oliver* held the Fourth Amendment does not shelter open fields from government surveillance because, unlike someone's home, they are "accessible to the public and the police . . . ."[159] And our Court of Appeals in *Grand Jury Proceedings* concluded someone's hair, which is on public display, is outside the scope of Fourth Amendment protection.[160] Extrapolating from these cases, Officer Culver argues Ms. Brookins does not have a privacy interest because he took the photo of Mr. Boone "from the 'public vantage point' of the Knights Road overpass where Officer Culver 'had a right to be.'"[161] But the present case involves a police officer's photograph of an individual after he jumped from the overpass for no reason other than to show his coworkers. The courts' teachings in *Ciraolo*, *Oliver*, and *Grand Jury Proceedings* involved the seizure of evidence from individuals suspected of crimes. Attempting to analogize these cases compares apples to oranges. Officer Culver's argument about Mr. Boone's whereabouts is not persuasive.

But location *is* sometimes part of the analysis. We look to substantive due process privacy case law rather than Fourth Amendment search and seizure case law. Our Court of Appeals's analysis thirteen years ago in *Luzerne*, finding a reasonable expectation of privacy in one's partially clothed body, provides helpful guidance.[162] A deputy sheriff discovered fleas on herself after she

served a bench warrant on a resident inside a squalid home.[163] The sheriff took a decontamination shower and realized there were no towels.[164] She wrapped hospital paper around her private areas.[165] Two male deputies entered the decontamination room and filmed the female deputy in her state of undress.[166] One of the male deputies then uploaded the video onto his work computer and showed it to his colleagues.[167] He also saved it in a public computer folder viewable by anyone with access to the network.[168] The female deputy sued the County and two individuals, amongst other things, for violating her Fourteenth Amendment right to privacy.[169] Our Court of Appeals held the female deputy had a reasonable expectation of privacy while in the decontamination room.[170] The finding of a privacy expectation turned on the location (a showering facility with a heavy wooden door) of the male deputies' unconsented-to filming.[171]

Our Court of Appeals's *Luzerne* analysis is distinguishable because the deputy sued to vindicate her own privacy rights. The issue facing us is not a violation of **Mr. Boone's** privacy rights, but a violation of **Ms. Brookins's** privacy rights in the photograph of her son.[172]

We are not persuaded Mr. Boone's location bears on his mother's privacy rights. We look again to the court of appeals's reasoning in *Marsh*. As Officer Culver argues, the child in *Marsh* incurred injuries at home, not in public. And medical personnel in *Marsh* presumably took the autopsy photographs at the morgue—again, not in public. But the court of appeals did not discuss the private settings where the accident and the photographs occurred. It instead focused on the act of publishing the photos: "the **publication** of death images interferes with 'the individual interest in avoiding **disclosure** of personal matters[]'" and "matters of private grief [are] not generally **shared** with the world at large."[173]

The court's focus on disclosure, rather than location at the time of fatal injury, makes sense. Parents cannot control where their children meet their untimely death. To focus on Mr. Boone's

location is to shift the focus of the reasonable expectation of privacy from Ms. Brookins to Mr. Boone. We cannot agree Ms. Brookins does not have a privacy interest in the photograph simply because Officer Culver took the photograph from an overpass with no public access and not inside a private residence.[174] We, like the court of appeals in *Marsh*, hold the Constitution protects a parent's right to control images of her fatally injured child against unwarranted public exploitation.[175]

ii.    **Ms. Brookins's individual privacy interest outweighs the police interest in the improper photograph.**

We proceed to the second step of the test: balancing the privacy interest against the interest in disclosure. "[A] person's right to avoid disclosure of personal matters is not absolute."[176] "Disclosure may be required if the government interest in disclosure outweighs the individual's privacy interest."[177] We consider the type of the record, the information it contains, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, public policy, or other recognizable interest militating toward access.[178]

These factors weigh overwhelmingly in Ms. Brookins's favor. The type of "record" is the photograph of Mr. Boone's injured body on the side of a road. The potential for harm in nonconsensual disclosure of this photograph is precisely what occurred: it ended up on social media and strangers showed it to Ms. Brookins. The injury from disclosure to the relationship in which the record was generated is a neutral factor. Officer Culver did not disclose the photograph within the confines of a relationship—for instance, an employment relationship where individuals must disclose certain private information—as Ms. Brookins did not have a relationship with the police officers at the scene of her son's jump. The adequacy of safeguards to prevent unauthorized

disclosure is also a neutral favor. There is evidence the Police Department had a policy barring officers from taking photos at crime scenes on their personal devices, which would weigh in favor of the City, but does not weigh in favor of Officer Culver, who did not adhere to the policy. Officer Culver acted far below the standard we expect of our experienced Philadelphia Police. The last two factors—the need for access and a statutory mandate or public policy militating toward access—weigh in favor of Ms. Brookins. Officer Culver had no legitimate reason to take the photo on his personal phone contrary to the Police Department's regulations cautioning officers against such conduct.

Ms. Brookins had a reasonable expectation of privacy in the photograph of her son and Officer Culver had no reason for disclosing it. Like the court of appeals in *Marsh*, we conclude Officer Culver's "intrusion into the grief of a mother over her dead son—without any legitimate governmental purpose—'shocks the conscience' and therefore violates [Ms. Brookins's] substantive due process right."[179]

### 4. Qualified immunity protects Officer Culver from liability for violating Ms. Brookins's constitutional right to privacy.

Officer Culver's conduct shocks the conscience. The question is whether he is personally liable in damages for his shocking departure from what we expect of our police. So, Officer Culver resorts to arguing he is entitled to qualified immunity because Ms. Brookins's right to privacy was not clearly established when he took the photograph.[180] Ms. Brookins responds courts have clearly established family members' right to privacy in pre-death moments of their loved ones.[181]

"At summary judgment, the burden is on the officer to establish an entitlement to qualified immunity."[182] "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[183] "A right is clearly established if the case law at the time of the alleged violation of the right would

have put government officials on fair notice that their conduct violated the plaintiff's rights."[184] "That is 'an objective (albeit fact-specific) question, where an officer's subjective beliefs are irrelevant.'"[185] The Supreme Court's "case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate."[186] The Supreme Court "has not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity."[187] The Court assumed, without deciding, a controlling circuit precedent could clearly establish law for purposes of section 1983 under certain circumstances.[188] Our Court of Appeals interprets the Supreme Court's qualified immunity jurisprudence to mean "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'"[189] "We may also take into account district court cases, from within the Third Circuit or elsewhere.'[190]

"In analyzing the 'clearly established law' prong, we proceed in two steps: we first 'define the right allegedly violated at the appropriate level of specificity' and then 'ask whether that right was "clearly established" at the time of its alleged violation.'"[191] "[T]he clearly established right must be defined with specificity[,]" and "not . . . at a high level of generality."[192] We analyze this question "in light of the specific context of the case . . . ."[193] In "exceedingly rare cases . . . the existence of the plaintiff's constitutional right is so manifest that it is clearly established by broad rules and general principles."[194]

Ms. Brookins does not argue this case is "a member of that class of 'easiest cases'" so we must address whether her right was clearly established, at the time Officer Culver took the photograph, under established law.[195] Officer Culver posits the following standard: a reasonable officer would not have known taking a photograph of Mr. Boone "on a public thoroughfare" would

violate Ms. Brookins's privacy interests under the Fourteenth Amendment because "the circumstances surrounding the injurious conduct [were] protracted and public in nature."[196] Ms. Brookins does not offer her own definition of the right.

We are mindful the Supreme Court cautions against defining constitutional rights "at a high level of generality."[197] For example, in *City of Escondido, California v. Emmons*, the Supreme Court rejected the "right to be free of excessive force" under the Fourth Amendment as "far too general[]" a definition for the purposes of the "clearly established" analysis.[198] Our Court of Appeals in *Jefferson v. Lias* rejected the citizen's proposed definition of the constitutional right—"one that 'bars an officer from opening gunfire into the driver's side window of a fleeing vehicle passing in front of him if the driver is not believed to be armed, did not previously act in a menacing manner, and if there is no immediate danger to the officer or bystanders[]'"—as too narrow.[199] But it also rejected the officer's proposed definition barring an officer from "[shooting] at a fleeing driver to protect those who his or her flight might endanger[]" as too broad.[200] Our Court of Appeals instead defined the right somewhere in the middle of the parties' proposed definitions.

Adopting these principles from the Supreme Court and Court of Appeals, we would stretch too far to define Ms. Brookins's constitutional right as "the individual interest in avoiding disclosure of personal matters[.]"[201] It would be too narrow—not to mention inaccurate, given Officer Culver's misplaced reliance on Fourth Amendment case law—to define Ms. Brookins's right as the right not to have an officer take "a photograph of [her] injured [son] on a public thoroughfare . . . when the circumstances surrounding the injurious conduct are protracted and public in nature."[202] So we will follow the example of our Court of Appeals in *Jefferson* and define the right somewhere in the middle. And like the court of appeals in *Marsh*, we think an appropriate formulation is a parent's right to control death images of the deceased from public exploitation.[203]

But this right is not clearly established. Other than *Marsh*, the cases Ms. Brookins cites involve privacy rights rooted in a source other than the Constitution, such as the Freedom of Information Act or common law.[204] But Ms. Brookins does not claim a violation of her rights under statutory or common law. She invokes her privacy right under the Constitution. And the Supreme Court and our Court of Appeals have not recognized a constitutional privacy right to control images of a deceased child. The court of appeals in *Marsh* is the only court of appeals to have recognized this right. So we lack both "binding opinions from our own Court" as well as a "robust consensus of cases of persuasive authority in the Courts of Appeals."[205] Several judges have recognized the right to privacy analyzed twelve years ago in *Marsh*, but these are primarily in cases bound by the *Marsh* precedent, and most of the judges did not find the challenged conduct actually violated the right.[206] Our Court of Appeals has, on at least one occasion, affirmed a district court finding a clearly established right based on one out-of-circuit court of appeals decision and two district court decisions.[207] But there, unlike here, district court judges in our Circuit authored the analysis.[208] Absent precedent from the Supreme Court, a "robust consensus in the Courts of Appeals," or even a consensus among our trial judge colleagues, we cannot find *Marsh* and a handful of district court cases bound by *Marsh* create a clearly established precedent in this Circuit such that Officer Culver had fair notice his conduct—although unquestionably callous and far below the standards we expect—violated Ms. Brookins's constitutional rights.

Officer Culver is entitled to qualified immunity from the constitutional privacy claim.

### B.  We grant summary judgment in favor of the City on Ms. Brookins's municipal liability claim alleging a failure to train officers on privacy rights.

The City moves for summary judgment on Ms. Brookins's *Monell* claim alleging a failure to train its officers on the privacy rights of family members.[209] The Supreme Court in *Monell v. Department of Social Services of City of New York* held "a municipality cannot be held liable under

[s]ection 1983 based solely on the conduct of its employees."[210] "For liability to attach under [s]ection 1983, the municipality itself must cause the constitutional violation at issue."[211] A section "1983 claim against a municipality may proceed in two ways."[212] "A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice[.]'"[213] One type of failure or inadequacy is a failure to train.[214]

Ms. Brookins's *Monell* claim is a failure to train claim.[215] She must show the City's failure to train its officers "amounts to deliberate indifference to the constitutional rights of those affected."[216] "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."[217] "[I]n a narrow range of circumstances" a pre-existing pattern of violations might not be necessary if the unconstitutional consequences of failing to train are patently obvious.[218] Still "the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury."[219] "Liability cannot rest only on a showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury.'"[220] "Rather, the causation inquiry focuses on whether 'the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'"[221] We must "predict[] how a hypothetically well-trained officer would have acted under the circumstances . . . ."[222] "It is insufficient to show that one particular officer was unsatisfactorily trained, since 'the officer's shortcomings may have resulted from factors other than a faulty training program.'"[223]

Like Officer Culver, the City first argues Ms. Brookins cannot establish a constitutional violation of her right to privacy because Mr. Boone jumped from the overpass in public.[224] We do

24

not agree Mr. Boone's location changes our analysis, and we need not address this issue again.[225] We turn instead to the City's argument it is not liable for failure to train.[226]

The City claims "there is no evidence on record to demonstrate that there was in [sic] inadequacies in the training of the Defendant Officers."[227] "[T]he record does not reflect . . . that the City failed to train its officers regarding the privacy rights of family . . . ."[228] Ms. Brookins responds "[i]t is evident from the testimony . . . the Police Department Directives are meaningless because police are only required to indicate that they received them and not that they understand their meaning."[229] Ms. Brookins excerpts an expert report opining the City failed to train its officers on mental health negotiations.[230] But she does not (aside from one cite to Sergeant Rivera's deposition in the brief's introduction) point to specific portions of the record showing the City failed to train its officers not to take inappropriate photographs. Training officers how to deal with suicidal individuals and training officers not to take photos of them are two discrete issues. Citing to an expert's opinion concerning the former does not establish a genuine dispute of material fact concerning the latter.

We nevertheless consider other materials in the record to determine whether anything supports Ms. Brookins's failure to train argument. Nothing does. The record shows the police department trained officers on the crime scene directive. Ms. Brookins relies on the deposition of Sergeant Rivera to show the officers did not receive "proper" training on the directives.[231] We find this quantum parsing of the training unpersuasive. During the deposition Ms. Brookins's counsel asked Sergeant Rivera, "[w]hat process does the city have to make sure police officers understand the directives?"[232] The sergeant started by explaining the trainings officers received for directives other than the crime scene directive.[233] He then swore "there is a directive on the crime scene. But officers also go through—when they go through the academy when they are recruits, they also go

through crime scene training. Certain times throughout their careers, there may be points where the MPO [Municipal Police Officer] board or commission will decide to give the officers further training, or our own city might give them further training . . . in person, usually via PowerPoint."[234] At this point Ms. Brookins's counsel said "I don't really want to ask you about the crime scene because we are really only [focusing] on the three directives here that I have mentioned."[235] Ms. Brookins's decision not to fully develop Sergeant Rivera's testimony as to the crime scene directive does not establish a genuine dispute of material fact with respect to the City's training program.

Other officers also testified about the training they received on the crime scene directive and/or the last time they read the directive. Lieutenant Miller swore he did not recall the Department holding trainings on the crime scene directive since at least 2019.[236] Officer Culver swore he did not think he had seen the crime scene directive since his time at the academy.[237] He graduated the academy in 2000.[238] Officer Clair could not remember what year he last saw the crime scene directive, "if it was last year or this year," but he swore the officers receive "MPO, municipal police officer training" for four or five days each year.[239] Officer Squares remembered reading the crime scene directive but could not recall exactly when, although he swore it was "possible" he had read it within the last five years.[240] Officer Andrews swore it had probably been two and a half years since he had seen the crime scene directive.[241] Chief Inspector Singletary swore he was familiar with the crime scene directive and he had probably read it when the Department updated it in June 2022, but he did not receive training for the updated policy.[242] Inspector Luca swore he had read the directive "plenty of times."[243] Detective Rovnan swore he had read the policy "once or so[.]"[244] During many of these depositions, Ms. Brookins's counsel asked the officers whether they were familiar with the directive but did not specifically ask when or if they received training on it. And when officers swore they had read the directive, Ms.

26

Brookins's counsel did not ask them whether they read the directive as part of their training. So, nothing in the record contradicts Sergeant Rivera's testimony officers receive crime scene training at the academy.

The undisputed record establishes the City provided officers with training on the crime scene directive at the academy but had not received training on the directive for at least a year. We further find the City's training program does not have a "causal nexus" with Ms. Brookins's injury.[245] Despite the somewhat infrequent training on the crime scene directive, numerous officers swore about what they could and could not do under the policy. Inspector Bachmayer swore police could use their private cell phones to take calls at crime scenes but could not use them to take pictures of victims or suspects.[246] Captain Deblasis swore he knew about the crime scene directive, and while he thought it permitted officers to use their cell phones in "exigent circumstances[,]" the directive would "[a]bsolutely not" permit officers to take a photo of a victim lying on the ground.[247] Detective Rovnan swore he did not know about the directive prohibiting personal cell phones at crime scenes but he felt "shocked and upset" when he learned about the photograph of Mr. Boone.[248] He swore taking such a photograph was "not a common policy" and not "something that should be professionally done."[249] Inspector Luca swore the crime scene directive prohibited officers from using their cell phones to take photographs but allowed officers to use their phones to capture evidence if needed.[250] He further swore he personally would not have taken a picture of the scene and he did not "know what that officer seen below or anywhere else that would have given him the opportunity to take a photo."[251] Officer Andrews swore "cell phones on scene should only be used if we need to make notifications."[252]

The record does not establish a failure to train by the City led to Officer Culver's conduct. Municipal liability does not result simply because the officers could have received someone's

perceived better training on the crime scene directive. Additional training would not have made much difference given most of the officers knew what the directive said and would have known better than to take a photo of someone on the ground after harming themselves. Officer Culver's conduct contravened normal behavior as an officer or a decent mature adult. But we cannot attribute blame for his shocking conduct to the City.

No dispute of material fact exists about the City's training policies. The City is entitled to judgment on the privacy interest *Monell* claim.

### C. We grant summary judgment in favor of Officer Culver on Ms. Brookins's intentional infliction of emotional distress claim.

Officer Culver moves for summary judgment on Ms. Brookins's intentional infliction of emotional distress claim. Ms. Brookins offers no cite to her alleged distress caused by Officer Culver's taking and circulating the photograph. His conduct is wrong, embarrassing to the City, and far below what we (and likely his fellow officers) expect of our police. But Ms. Brookins adduced no evidence Officer Culver's taking and circulating the photograph caused her emotional distress. We grant summary judgment in favor of Officer Culver on the emotional distress claim.

The elements of a claim for intentional infliction of emotional distress under Pennsylvania law requires Ms. Brookins to show Officer Culver's conduct in talking and circulating the photograph is: (1) extreme and outrageous; (2) intentional or reckless; (3) causes emotional distress; and (4) the distress must be severe.[253]

Officer Culver makes two arguments in support of summary judgment. First, he argues Ms. Brookins's claim fails for lack of proof because Pennsylvania law requires expert medical testimony to support emotional distress damages and she has no such expert.[254] Second, he argues his conduct is not "extreme and outrageous" as required by Pennsylvania law.[255] Ms. Brookins responds she identified ten treating medical and mental health professionals in her Rule 26

disclosures, produced over 1,500 pages of medical records, and swore she consulted with mental health professionals after March 18, 2022 and suffered distress including anxiety and sleep issues.[256] She argues the record shows "competent medical evidence" to support her claim. She alternatively argues whether she can present "competent medical evidence" is an issue "best left for the time of trial and for the jury."[257] In response to Officer Culver's second argument, Ms. Brookins argues his conduct in photographing Mr. Boone and then sharing the photograph is extreme and outrageous. Officer Culver replies Ms. Brookins did not identify an emotional distress expert, did not produce an expert report, her treating physicians cannot now opine on causation, and by generally referring to 1,500 pages of produced medical records she does not meet her burden on summary judgment as to the causation element of her claim.[258]

We focus on the proof of emotional distress caused by Officer Culver's reckless act and apply Pennsylvania law to this state law claim. The Pennsylvania Supreme Court in *Kazatsky v. King David Memorial Park, Inc.* examined the proof of damages on an intentional infliction of emotional distress claim.[259] The court reasoned (over thirty-seven years ago) it would be "unwise and unnecessary" to allow recovery on a such a claim "predicated on an inference based on the defendant's 'outrageousness' without expert medical confirmation that the plaintiff actually suffered the claimed distress."[260] The court held the "existence of the alleged emotional distress must be supported by competent medical evidence."[261]

Officer Culver proclaims *Kazatsky* "unequivocally requires" expert medical testimony and Ms. Brookins's treating physicians and providers cannot be experts and are "prohibited" from testifying as to causation.[262] We disagree with Officer Culver's broad-brush application of the Pennsylvania Supreme Court's teachings in *Kazatsky*. We instead read the Pennsylvania Supreme Court in *Kazatsky* as requiring "competent medical evidence" to support a claim for intentional

infliction of emotional distress based on the Pennsylvania Supreme Court's express concern recovery for "outrageous" conduct should not be left for a jury to decide unaided by expert testimony.[263] It is not unusual to require expert medical testimony to show causation in tort cases and we do not read Ms. Brookins's opposition as arguing otherwise. She concedes she needs "competent medical evidence" to prove her claim and points to her earlier disclosed treating physicians and her medical records from the treating physicians.[264]

Officer Culver takes *Kazatsky* one step further and argues Ms. Brookins's treating physicians are "prohibited" from testifying on causation. We disagree. Treating physicians may testify as to causation and, in fact, Judge Joyner in the case cited by Officer Culver admitted a treating physician's expert report.[265] In *Brenner v. Consolidated Rail Corp.*, a machine operator sued his former employer, Conrail, for injuries suffered at work. Conrail moved for summary judgment arguing Mr. Brenner did not have admissible expert evidence of causation because he specifically retained his treating physician as a causation expert and the expert report did not conform to Federal Rule of Civil Procedure 26(a)(2)(B).[266] Mr. Brenner did not contest his obligations but argued his treating physician's causation report in fact complied with Rule 26.[267]

Judge Joyner explained, as a matter of procedure, parties must disclose their experts to be used at trial and provide an expert report under Rule 26(a)(2)(A) and (B).[268] Mr. Brenner identified his treating physician and surgeon as his causation expert and produced the physician's causation opinion.[269] Judge Joyner did not exclude the treating physician's testimony under Rule 26(a)(2)(B) and concluded Conrail's objections went to the weight, and not the admissibility, of the treating physician's testimony.[270] Judge Joyner explained treating physicians ***may*** testify about a patient's treatment and diagnosis without submitting an expert report but, if a plaintiff specifically retains

his treating physician to provide opinion testimony on causation, the physician must comply with the expert report requirements of Rule 26(a)(2)(B).[271]

Chief Judge Goldberg denied summary judgment over two years ago in a negligence case based on an objection to expert causation testimony.[272] The defendants in *Schweikert v. Eagle* moved for summary judgment arguing the plaintiff neither identified a causation expert nor served expert reports.[273] Chief Judge Goldberg explained Rule 26(a)(2)(A) and (B) requires a party to disclose expert witnesses and provide the expert's report to the opposing party.[274] Treating physicians may testify as lay witnesses based on their observations.[275] If treating physicians opine as to causation, they must be disclosed as experts under Rule 26 "only if they are 'retained or specifically employed to provide expert testimony in the case' or if their 'duties as the party's employee regularly involve giving expert testimony.'"[276] Treating physicians who "'form their opinion on causation or prognosis as part of the ordinary care of a patient,' . . . are not required to provide Rule 26(a)(2)(B) expert reports."[277] We allow this testimony  because "it is commonplace for a treating physician 'to consider things such as the cause of the medical condition, the diagnosis, the prognosis and the extent of disability caused by the condition, if any.'"[278]

So, we disagree Ms. Brookins's treating physicians are "prohibited" from testifying as to causation. But this is really not the issue. We see the issue as Ms. Brookins's inability to meet her burden of adducing evidence essential for trial proving her intentional infliction of emotional distress claim. Officer Culver, as the party moving for summary judgment on the claim, must demonstrate there is an absence of evidence to support Ms. Brookins's claim.[279] Officer Culver argues there is no evidence in the record to support the photograph caused Ms. Brookins to suffer emotional distress.[280]

Ms. Brookins simply points to the identity of her treating physicians made in disclosures and 1,500 pages of medical records produced in the litigation. The Supreme Court through Rule 56 requires Ms. Brookins cite evidence in the record showing a genuine issue of fact for trial; she must "cit[e] to particular parts of materials in the record."[281] She must adduce something more than a conclusion; she must provide evidence from which a rational trier of fact can find in her favor. Yet Ms. Brookins does not cite a single reference establishing the circulation of the photograph caused her emotional distress. Her document-dump of medical records does not satisfy her burden on summary judgment.

We are not required to sift through 1,500 pages of medical records in the hope of finding a fact issue on whether Officer Culver's circulating the photograph caused her severe emotional distress. It is true even a perfunctory scan of the medical records is sufficient for us to conclude Ms. Brookins suffered emotional distress. But because Ms. Brookins did not identify one of her treating physicians as an expert, she has no expert report on causation on which to rely. With no expert report on causation or summary of opinion by a treating physician, we cannot conclude this emotional distress stemmed from the photograph as opposed to the grief from her child's self-harm. As a result, we have nothing in the record creating a fact issue on causation.

Officer Culver is entitled to summary judgment on the intentional infliction of emotional distress claim—not because his reckless conduct is not outrageous or because she cannot proceed as a matter of law—but because Ms. Brookins did not cite a single piece of evidence establishing Officer Culver's circulation of the photograph caused her severe emotional distress.[282]

**D. We grant summary judgment in favor of Detective Walsh and Inspector Luca on the Fourteenth Amendment state-created danger claim and derivative wrongful death claim.**

Ms. Brookins sought leave to amend her Complaint in September 2024 (months after the two-year statute of limitations expired in March 2024) to add claims related to the officers' interactions with Mr. Boone for over two hours on the overpass.[283] We granted her leave to assert these overpass claims in her administratrix capacity subject to her later showing the state actors are estopped from asserting the statute of limitations bar under the fraudulent concealment doctrine.[284] We first address whether she has met her burden to show fraudulent concealment to toll the statute of limitations before reaching the merits of her constitutional and related wrongful death claims challenging the officers' efforts to persuade her son to not harm himself.

**1. The substantive due process claim is not time-barred as we find genuine issues of material fact on whether the police fraudulently concealed the bodycam and a communication with a therapist.**

The City moves for summary judgment on Ms. Brookins's Fourteenth Amendment substantive due process state-created danger claim arguing Ms. Brookins did not prove fraudulent concealment allowing her to toll the two-year statute of limitations to bring this claim in September 2024.[285] We disagree after finding genuine issues of material fact as to the City's fraudulent concealment of the body camera footage and Detective Walsh's alleged discussion with a therapist working with Mr. Boone.

Ms. Brookins's substantive due process claim filed approximately thirty months after the March 2022 incident is time-barred. But "[w]here, 'through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry,' the defendant is estopped from invoking the bar of the statute of limitations[]" under Pennsylvania law.[286] The "defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an

intent to deceive; unintentional fraud or concealment is sufficient."[287] Fraudulent concealment only applies if "[a] defendant . . . committed some affirmative independent act of concealment upon which [a] plaintiff[] justifiably relied."[288] But a duty to speak must exist for fraudulent concealment to occur; "[m]ere silence in the absence of a duty to speak cannot suffice to prove fraudulent concealment."[289] Mere mistake or lack of knowledge is also insufficient.[290] Ms. Brookins today bears the burden of proving the police's fraud or concealment by clear and convincing evidence.[291] "While it is for the court to determine whether an estoppel results from established facts, it is for the jury to say whether the remarks that are alleged to constitute the fraud or concealment were made."[292]

The City argues Ms. Brookins cannot show a police officer fraudulently concealed information, such as the existence of body-worn camera footage.[293] Her conversations with Detective Walsh and Lieutenant Seamen did not prevent her from recognizing the validity of her claims because she continuously pursued legal action.[294] At the same time, the City claims Ms. Brookins "failed to take any necessary follow ups . . . to obtain the information she sought" such as filing a complaint with the Philadelphia Police Department.[295] The 8th and 15th Police Districts did not have body-worn cameras so the Defendant officers could not have provided footage to Ms. Brookins because it did not exist.[296] Although Officer Andrews wore a body camera, the City argues, without citing the record, "the record shows that the . . . video was not withheld from [Ms. Brookins]."[297] Ms. Brookins responds Detective Walsh, Lieutenant Seamen, and the City actively misled her with respect to body camera footage.[298]

The evidence shows questions of fact surrounding Ms. Brookins's conversations with Detective Walsh on March 19, 2022 and a woman named Mary on April 19, 2022, both of whom told her no body camera footage of the incident existed, and with Lieutenant Seamen on April 28,

2022, who told her he could not give her information but did not specifically say anything about body camera footage.[299] We see other questions of fact arising from evidence Ms. Brookins asked an unknown Police Department official from the Northeast Detectives Office, on an unidentified date, whether officers from the 8th District wore body cameras during the incident, and the official told her "there were no body worn camera recordings and no video tape recordings."[300] Ms. Brookins then sought legal help.[301] She only found out body camera footage existed when she spoke with Lieutenant Miller toward the end of April 2024—almost three months after she filed this case and after the statute of limitations expired.[302]

We assume for the purposes of summary judgment Ms. Brookins spoke with Detective Walsh, Mary, an unidentified Police Department official, and Lieutenant Seamen, and we further assume the conversations took place as she says they did.[303] We disregard Ms. Brookins's conversation with Lieutenant Seamen because, even viewing the facts in the light most favorable to Ms. Brookins, a reasonable jury could not find fraudulent estoppel resulted from the conversation between Ms. Brookins and Lieutenant Seamen as they did not discuss body worn camera footage.[304] But we still must decide if estoppel results from Ms. Brookins's conversations with other individuals from the Police Department.[305] She must show these conversations caused her not to pursue this substantive due process claim for the officers' conduct on the overpass.

We look to our Court of Appeals's guidance in *Swietlowich v. Bucks County*, where police officers allegedly falsified a cell check log to hide their inadequate cell inspections after a detainee committed suicide in jail.[306] Our Court of Appeals explained "[t]he plaintiff must establish that she relied to her detriment on wrongful acts of the defendant before she can invoke the ban of estoppel."[307] "If what the defendant did had not the slightest influence on the plaintiff, then she has no ground to invoke that conduct as the basis for an estoppel and the defendants' wrongful act

in altering the log was irrelevant."[308] "To establish her case, plaintiff had to prove that she delayed bringing her suit because she reasonably believed that the police officers' conduct was not actionable based on their false statements of adequate inspections and of having done all that they could."[309]

We find unpersuasive the City's argument body worn camera footage could not have been provided to Ms. Brookins because officers from the 8th and 15th Police Districts did not wear body cameras. This is plainly not true since the City eventually produced body camera footage. Having to retrieve the footage from a different district is not the same thing as not being able to provide it.[310] We also reject the City's argument it did not withhold the footage from Officer Andrews's body camera; Ms. Brookins started asking for footage right after her son jumped off the bridge but did not receive it until August 2024.[311]

We lastly do not agree Ms. Brookins's eventual legal action suggests the representations of the officers and personnel with whom she spoke did not discourage her from pursuing her remedies. The City's argument here is Ms. Brookins is too late to bring this claim.  Ms. Brookins's Complaint filed in January 2024 actually cuts against the City's argument because at that point she did not know about the bodycam footage and therefore limited her case to claims arising from the photograph of her son.[312] Seemingly contradicting its own argument about Ms. Brookins's due diligence and resultant lawsuit, the City also argues Ms. Brookins did not do ***enough*** to investigate because she did not file a complaint with the Police Department about the photograph.[313] Ms. Brookins's apparent failure to file an internal complaint—like the initiation of her lawsuit—has little bearing on our analysis. Like her initial Complaint in federal court, any internal complaint Ms. Brookins could have filed before obtaining the body camera footage would have been solely concerned with the taking and dissemination of the photograph, not the officers' interactions with

Mr. Boone on the overpass. Ms. Brookins spoke with officers and personnel who allegedly told her no body camera footage existed. Her original Complaint, devoid of references to pre-harm conduct, confirms she relied on their statements to her detriment.

We also note an important piece of evidence in the record which neither the City nor Ms. Brookins mentions in their briefing. In addition to telling Ms. Brookins no body camera footage existed, Detective Walsh—according to the notes Ms. Brookins took during their March 19, 2022 call—claimed Mr. Boone spoke with his therapist while on the bridge. Ms. Brookins wrote, "he . . . mentioned Miss razor they of Gaudenzia house. he stated that Miss Razer Marcus's therapist was on the phone with Marcus trying to help get him down! [sic]"[314] There is a dispute of fact as to whether Detective Walsh actually told Ms. Brookins he allowed the therapist to speak to Mr. Boone.[315] He swore he did not tell Ms. Brookins that.[316] This would be a jury question if this case went to trial.

But assuming for the purposes of summary judgment Detective Walsh told Ms. Brookins Therapist Raysor spoke on the phone with Mr. Boone, estoppel results from this communication. Part of Ms. Brookins's state-created danger claim against Detective Walsh arises from the later-discovered fact Detective Walsh did ***not*** allow Mr. Boone to speak to his therapist. Ms. Brookins argues Detective Walsh "did not allow Ina Raysor, a trusted mental health professional, who was then currently working with Marcus through his addiction and mental health issues at the Gaudeniza Diagnostic Rehabilitation Center, to speak with Marcus despite calling her on the telephone as Marcus stood on the overpass and despite her asking to speak to him."[317] The earlier contradictory statement by Detective Walsh—which we assume he made for the purposes of summary judgment—is plainly important to Ms. Brookins's fraudulent concealment theory. If Detective Walsh told Ms. Brookins Mr. Boone ***did*** speak with his therapist, and Ms. Brookins

believed him, she may have relaxed her vigilance, assuming the officers did all they could. She would not have known she had a cause of action until she later learned—outside the statute of limitations—Detective Walsh did ***not*** permit Therapist Raysor to speak to Mr. Boone while he stood on the overpass.[318]

Assuming the jury finds the conversations Ms. Brookins had with various officers and personnel at the Police Department took place exactly the way she swears, she establishes by clear and convincing evidence the City, through its officers and personnel, fraudulently concealed the existence of body camera footage and the fact Detective Walsh did not permit Therapist Raysor to speak to Mr. Boone. We conclude the City's fraudulent concealment equitably tolled the statute of limitations on Ms. Brookins's state-created danger substantive due process claim until she learned of the officers' conduct on the bridge.[319]

### 2. Detective Walsh and Inspector Luca did not cause a state-created danger as a matter of law.

The City also moves for summary judgment on behalf of Detective Walsh and Inspector Luca on the merits of the state-created danger claim challenging the conduct on the overpass during the over two hours of discussions with Mr. Boone.[320] We now have the benefit of watching, and re-watching, the bodycam footage offering the best adduced evidence of the police interactions with Mr. Boone. Ms. Brookins's allegations about the officers' conduct troubled us, but the bodycam footage shows different—and uncontroverted—facts. Ms. Brookins is left with citing to three instances she believes merit a finding of state-created danger: Inspector Luca's unidentified "words and actions[,]" which made Mr. Boone "more elevated and increasingly agitated[]"; Detective Walsh's refusal to allow Therapist Raysor to talk with Mr. Boone although Mr. Boone did not ask for her or know the police called her; Detective Walsh's remark, "I'm enjoying this[,]" to his colleagues at least twenty-five feet away from Mr. Boone approximately five minutes before

Mr. Boone harmed himself; and Detective Walsh's private conversation with Detective Rovnan about house remodeling "closer to the instant when [Mr. Boone] jumped[.]"[321] There is no evidence Mr. Boone heard these statements other than Inspector Luca's undefined words and actions. We studied each of these specific instances compared to guidance from several judges in similar cases. We held oral argument on this issue and Ms. Brookins's counsel repeatedly asked us to review the whole bodycam to get a fair context mindful mental illness is not a choice but a disease. We wholeheartedly agree with Ms. Brookins's counsel on this point. Our extensive review confirms our finding Detective Walsh's and Inspector Luca's alleged conduct did not raise to the level of a state-created danger as a matter of law.

We begin with a review of guidance from appellate courts. The Supreme Court's holding in *DeShaney v. Winnebago County Department of Social Services* " stands for the proposition that the Due Process Clause imposes no affirmative duty to protect a citizen who is not in state custody."[322] But "this does not mean that no constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'"[323] "This complement to the *DeShaney* holding has come to be known in its progeny as the 'state-created danger doctrine.'"[324] Under this doctrine, "liability may attach where the state acts to **create** or **enhance** a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process."[325] The state-created danger exception has four elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to

a member of the public in general; and (4) the state actor affirmatively used his or her authority in a way that created danger to the citizen or rendered the citizen more vulnerable to danger than had the state not acted at all.[326]

Our Court of Appeals has identified three potential levels of culpability required to shock the conscience. "In 'hyperpressurized environment[s] requiring a snap judgment,' an official must actually intend to cause harm . . . to be liable."[327] "[I]n cases where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient."[328] Then "there are circumstances involving something less urgent than a 'split-second' decision but more urgent than an 'unhurried judgment.'"[329] In these situations, where "the state actor is required to act 'in a matter of hours or minutes,' we require that the state actor 'disregard a great risk of serious harm.'"[330]

Our colleagues here and around the country have studied the tragic intersection between the state-created danger doctrine and suicide. We turn now to the interplay between the state-created danger doctrine and suicide.[331] Courts of appeals have reached different conclusions on whether the state-created danger doctrine applies to suicide cases. Our Court of Appeals examined the state-created danger doctrine in the student suicide case *Sanford v. Stiles*.[332] High school student Michael Sanford passed his ex-girlfriend, Karen Martin, a note suggesting a story he had heard about Ms. Martin and someone named Ryan "almost made [him] want to go kill [himself]."[333] Ms. Martin approached a school guidance counselor about the situation and the counselor gave the note to Mr. Sanford's guidance counselor, Pamela Stiles.[334] Counselor Stiles spoke with Mr. Sanford and concluded he did not present signs of wanting to harm himself.[335] She did not contact the school psychologist or Mr. Sanford's mother.[336] Mr. Sanford visited Counselor Stiles about a week later and asked if a blonde-haired girl had given her the note.[337] Counselor

Stiles responded she could not tell him that information and asked Mr. Sanford if he wanted to talk further; he declined.[338] Mr. Sanford hanged himself that evening.[339] Mr. Sanford's mother sued Counselor Stiles under a state-created danger theory, alleging the counselor's actions increased Mr. Sanford's risk of suicide.[340]

Our Court of Appeals applied the four-prong state-created danger test to hold no reasonable jury could find Counselor Stiles acted with the requisite degree of culpability or created an opportunity for harm to occur which would not have existed otherwise.[341] First, without deciding whether the deliberate indifference standard or a more heightened standard applied, our Court of Appeals concluded Counselor Stiles's decision not to contact the school psychologist or Mr. Sanford's mother did not shock the conscience.[342] No one—including Mr. Sanford's own family members and ex-girlfriend—seriously believed Mr. Sanford would commit suicide, and Counselor Stiles did not disregard a risk Mr. Sanford presented because she spoke with him and concluded he was not suicidal.[343] Second, our Court of Appeals found no question of fact as to whether Counselor Stiles "used her authority 'in a way that created a danger'" to Mr. Sanford or rendered him more vulnerable than he would have been.[344] Our Court of Appeals found the link between Counselor Stiles's conduct and Mr. Sanford's death too far attenuated to hold her liable; the record did not suggest Mr. Sanford relied on Counselor Stiles for support; and Counselor Stiles did not interfere with Mr. Sanford's relationship with his mother. Our Court of Appeals concluded the case really focused on Counselor Stiles's "failure to **prevent** Sanford's death" and "mere failure to protect an individual . . . does not violate the Due Process Clause."[345]

In deciding Counselor Stiles did not create a danger to Mr. Sanford, our Court of Appeals relied on the seminal analysis offered by the Court of Appeals for the Tenth Circuit in *Armijo ex rel. Chavez v. Wagon Mound Public Schools*.[346] In *Armijo*, the Court of Appeals for the Tenth

Circuit "extended application of the state-created danger theory to instances of suicide, undeniably another form of private violence."[347] A sixteen-year-old special education student, Philadelfio Armijo, had a history of making suicidal remarks.[348] The student's aide and the school counselor knew Mr. Armijo had access to firearms.[349] One day the school principal reprimanded Mr. Armijo for harassing a younger student.[350] Mr. Armijo responded by threatening physical harm to the teacher who had reported the incident.[351] The principal suspended Mr. Armijo and the school counselor drove him home and dropped him off without contacting his parents, violating the school's disciplinary policy.[352] Mr. Armijo later committed suicide with a rifle.[353] The court of appeals affirmed the district court's denial of summary judgment, holding the school principal and the school counselor put Mr. Armijo at a substantial risk of harm by suspending him, and then leaving him alone with access to firearms when they knew Mr. Armijo might be suicidal and had access to firearms.[354] They acted in "conscious disregard of the risk of suicide," and their conduct could be viewed as conscience-shocking at trial.[355]

Our Court of Appeals again examined the state-created danger doctrine six years ago in *Haberle v. Troxell* addressing police liability when a person with a "a serious mental health episode involving severe depression" shot and killed himself immediately after the police knocked on his apartment door.[356] Timothy Nixon told his partner he was suicidal then entered his cousin's apartment with a stolen handgun.[357] Mr. Nixon's partner notified the police; Officer Troxel obtained a warrant for Mr. Nixon's arrest and went to the apartment building.[358] Some officers suggested asking the Pennsylvania State Police to send crisis negotiators and suggested asking Mr. Nixon's partner to help them communicate with Mr. Nixon.[359] Officer Troxell rejected these suggestions, called the officers "a bunch of f[---]ing pussies[,]" and knocked on the apartment door, identifying himself as a police officer.[360] Mr. Nixon promptly shot himself.[361] Mr. Nixon's

partner sued Officer Troxell alleging his actions (knocking on the door and announcing police presence) constituted a state-created danger.[362] Our Court of Appeals found Judge Leeson properly applied the intermediate standard for situations involving a "hurried deliberation" and agreed Officer Troxell's decision to ignore the other officers and knock on the apartment door did not show conscious disregard of a great harm of risk to Mr. Nixon.[363] "[T]he fact that Troxell chose to immediately knock while other officers counseled waiting manifests only a disagreement over how to manage a risk, not a disregard of it."[364]

Courts of appeals outside of our Circuit provide additional guidance in state-created danger suicide cases. The Court of Appeals for the Sixth Circuit, in contrast with the Court of Appeals for the Tenth Circuit, "treat[s] suicide differently[]" than other cases involving state-created danger.[365] *Cutlip v. City of Toledo* is illustrative. The case arose from a two-hour police standoff with Rocky Cutlip, who held a shotgun to his head "while gripped in the throes of a mental and emotional crisis[.]"[366] Police negotiators arrived on scene and the lead negotiator attempted to form a bond with Mr. Cutlip by speaking to him about his family and other common experiences.[367] The lead negotiator found it difficult to develop a rapport with Mr. Cutlip because he (like Mr. Boone in this case) "would fluctuate between calmness and excitement."[368] At one point during the negotiations Mr. Cutlip asked to speak with his father and the police told him they would grant this request if he put his shotgun down.[369] Mr. Cutlip refused to put his shotgun down and instead pointed the gun at his head and released the safety.[370] The officers, aware Mr. Cutlip might kill himself if they attempted to force him to relinquish the gun, asked the SWAT team to move in and prevent the suicide attempt.[371] The officers planned to deploy a "flash-bang" device to distract Mr. Cutlip, then disarm him.[372] But Mr. Cutlip pulled the trigger and killed himself when the SWAT team deployed the device and entered the doorway to Mr. Cutlip's bedroom.[373] The court of appeals explained "a

situation where the victim committed suicide does not fit neatly into the state-created-danger doctrine"; "where a person makes a free and affirmative choice to end his life, the responsibility for his actions remains with him."[374] "That a state official somehow contributed to a person's decision to commit suicide does not transform the victim into the state's agent of his own destruction."[375]

Despite its reservations about the applicability of the doctrine, the Court of Appeals for the Tenth Circuit applied the state-created danger doctrine because it had "some question . . . about whether [Mr. Cutlip] intentionally committed suicide or whether he involuntarily pulled the trigger after the police detonated the flash-bang device . . . ."[376] The court reviewed whether an affirmative act by the police increased the risk Mr. Cutlip would kill himself and concluded the only possible affirmative act—the detonation of the flash-bang device and the forced entry into the bedroom—did not support a finding of deliberate indifference.[377] The court found the police officers believed a forced entry "presented a better chance for [Mr. Cutlip's] survival than not going in at all . . . ."[378] The plaintiff argued the officers' belief Mr. Cutlip was about to kill himself—therefore making the flash-bang device necessary—was unreasonable because forty-seven minutes elapsed from the time the negotiators asked for the SWAT team and the time the SWAT team entered the home, "which should have warned the police at the scene that [Mr. Cutlip] was not really about to commit suicide."[379] The court found "the amount of elapsed time [did] not create a genuine issue of material fact[]" because "the negotiators repeatedly renewed their calls for intervention throughout the forty-minute period . . . ."[380] Even if Mr. Cutlip involuntarily pulled the trigger after the flash-bang the police did not act "with conscious indifference; they were aware of this risk, attempted to minimize it, and were sadly unsuccessful."[381]

The Court of Appeals for the First Circuit in *Hasenfus v. LaJeunesse* affirmed a dismissal of a case where a teacher reprimanded a fourteen-year-old student, told her to return to the locker room, and the student attempted to hang herself in the locker room.[382] The court found the teacher had not acted maliciously to cause harm to the student or otherwise behaved in a conscious-shocking way.[383] The Court of Appeals for the First Circuit again studied the state-created danger in *Coscia v. Town of Pembroke, Massachusetts*, where a twenty-one-year old man committed suicide the day after police arrested him, placed him in leg restraints, and followed an evaluation protocol showing a high suicide risk.[384] The police released him without having a doctor examine him.[385] The court of appeals found the police's alleged treatment of the man did not suggest the state intensified the man's self-destructive tendency and the plaintiff's "claim of causation leads to a liability beyond what due process imposes . . . ."[386]

The Courts of Appeals for the Seventh Circuit examined state-created danger in *Martin v. Shawano-Gresham School District*, where an assistant principal suspended a student, who became distraught and hanged herself when she went home after school, and *Collignon v. Milwaukee County*, where a twenty-eight-year-old man committed suicide after being released from police custody.[387] In both cases, the court of appeals found the state did not create or increase the risk of suicide, even if the arrest or the suspension caused severe emotional distress.[388] The court in *Martin* found no affirmative act because—in contrast with the facts in *Armijo* —the student went home **after** school and had given no indication of suicidal tendencies; in *Armijo*, the school sent the student home in the middle of the day knowing he could not fully care for himself, had previously threatened suicide, and had access to firearms.[389] The court in *Collignon* explained the police officers temporarily detained a mentally ill man wandering the streets and returned him to his father and stepmother; their conduct actually reduced the risk rather than increased it.[390]

45

The Court of Appeals for the Eleventh Circuit studied state-created danger in *Wyke v. Polk County School Board*, where thirteen-year-old Shawn Wyke committed suicide at home after attempting suicide twice at school in the few days before his death.[391] Another student found Mr. Wyke in the restroom after his first suicide attempt and told his own mother, Brenda Morton, who called the school and told the dean of students about the situation.[392] The dean reassured Ms. Morton "he would take care of it."[393] The dean of students called Mr. Wyke to his office, spoke with him, and read him Bible verses, but did not notify anyone (including Mr. Wyke's mother) about the suicide attempt.[394] Mr. Wyke committed suicide. His mother sued the school for failing to train its employees in suicide prevention, arguing her son's death resulted from the school's decision not to notify her of her son's suicide attempt, hold her son in protective custody, procure psychiatric evaluation for her son, or provide him with appropriate support.[395] The court of appeals rejected the mother's argument the school cut off her boy's private sources of aid and rendered him more vulnerable to harm, "thereby incur[ing] an affirmative duty to protect him[]" under *DeShaney*.[396] The school did not "affirmatively prevent[]" the mother from saving her son's life because the dean of students did not stop Ms. Morton from calling Ms. Wyke; he simply told Ms. Morton he would take care of the situation.[397] If the school had affirmatively prevented someone from helping Mr. Wyke, "perhaps [the court's] analysis would have been different."[398]

We turn to the facts before us, mindful we must review three or four cited instances of disputed conduct within the larger context of the two-and-a-half hours of bodycam footage: Inspector Luca's unidentified "words and actions[,]" which made Mr. Boone "more elevated and increasingly agitated[]"; Detective Walsh's refusal to allow Therapist Raysor speak to Mr. Boone; Detective Walsh's remark, "I'm enjoying this[,]" approximately five minutes before Mr. Boone

harmed himself; and Detective Walsh's conversation with Detective Rovnan about house remodeling "closer to the instant when [Mr. Boone] jumped[.]"[399]

### i.  Detective Walsh did not create danger to Mr. Boone when he allegedly refused to permit Mr. Boone's therapist to speak to him.

We first consider Detective Walsh's alleged refusal to allow Therapist Raysor speak to Mr. Boone. There is a fact issue concerning Detective Walsh's conversation with Therapist Raysor. Ms. Brookins's counsel obtained an affidavit from Therapist Raysor dated the same day as their response brief, which—according to the City—Ms. Brookins's counsel did not disclose in discovery.[400] We do not find persuasive the City's argument we should not consider the affidavit due to nondisclosure during discovery; such an argument should be reserved for a motion in limine. Notwithstanding the propriety of the City's argument at this stage, a fact issue still arises. Detective Walsh swore he contacted Gaudenzia (a treatment center providing mental health and substance abuse services) but they were "kind of obstructionists" due to health care privacy laws and he never learned the name of Mr. Boone's therapist.[401] Therapist Raysor's post-discovery affidavit (without the benefit of cross-examination) claims she spoke directly to Detective Walsh, and he refused to let her speak to Mr. Boone.[402] But we find this does not create a genuine issue of material fact as the City would be entitled to judgment even if Detective Walsh did not let Therapist Raysor speak to Mr. Boone.[403]

Under the state-created danger four-part test we must ask whether (1) the harm ultimately caused was foreseeable and fairly direct; (2) Defendant Walsh acted with a degree of culpability that shocks the conscience by refusing to permit Therapist Raysor to speak to Mr. Boone; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts; and (4) Detective Walsh affirmatively used his or her authority in a

way that created danger to the citizen or rendered the citizen more vulnerable to danger than had he not acted at all.[404]

We start with the fourth prong. "[A] state's failure to take affirmative action to protect a victim from the actions of a third party will not, in the absence of a custodial relationship . . . support a civil rights claim."[405] "It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."[406] "But a specific and deliberate exercise of state authority, while necessary to satisfy the fourth element of the test, is not sufficient."[407] "There must be a direct causal relationship between the affirmative act of the state and plaintiff's harm."[408] In other words, "the state's action was the 'but for cause' of the danger faced by the plaintiff."[409] Here, where the police did not **cause** the danger but arguably made it worse, it must be "'conceivable that, but for the intervention of the police,' which arguably put the victim . . . in a 'worse position' and increased [his] risk of danger," Mr. Boone would not have harmed himself.[410]

Our first question is whether Detective Walsh acted affirmatively by calling Therapist Raysor or whether he simply failed to act when he told Therapist Raysor she could not speak to Mr. Boone. We think it is the former. The court of appeals's analysis in *Wyke* and our Court of Appeals's analysis in *Sanford* are illustrative. The court in *Wyke* found no affirmative act because the dean of students did not "affirmatively prevent" anyone from notifying Mr. Wyke's mother about the suicide attempt; he simply did not call Mr. Wyke's mother himself.[411] Our Court of Appeals in *Sanford* concluded Counselor Stiles did not affirmatively prevent Mr. Sanford from speaking with his mother; she simply chose not to contact his mother after evaluating Mr. Sanford.[412]

We draw a contrast when viewing the facts in favor of Ms. Brookins. Detective Walsh **did** call Mr. Boone's therapist and decided she could not speak to Mr. Boone. We think this decision

falls into the category of "affirmatively preventing" someone from helping an individual in crisis. Even so, a reasonable jury could not conclude the refusal to permit Therapist Raysor speak to Mr. Boone was the "but for cause" of increased danger. We cannot find as a matter of law Mr. Boone would not have jumped off the bridge if he had been permitted to speak to his therapist.[413] Our analysis might be different if, for example, Mr. Boone **asked** to speak with his therapist, Detective Walsh said no, and Mr. Boone harmed himself shortly thereafter. Our analysis might also be different if Detective Walsh called Therapist Raysor of his own accord, Mr. Boone became aware she was on the line, and Detective Walsh denied him the opportunity to speak to her. But we have no evidence Mr. Boone asked to speak with his therapist and the bodycam confirms he did not ask to speak to a therapist; nor is there evidence he knew Detective Walsh contacted his therapist. Detective Walsh's actions did not make Mr. Boone **more** vulnerable to harm or put him in a worse position. Allegedly refusing to permit Therapist Raysor to speak to Mr. Boone left Mr. Boone precisely as vulnerable as he was before the call. Leaving someone in the same position does not rise to the level of state-created danger.[414]

We also note Mr. Boone jumped at least thirty minutes after Detective Walsh allegedly refused to let the therapist speak to him.[415] It is true "a tight temporal nexus between act and harm" is not always necessary.[416] But we must consider the gap between the call to the therapist and Mr. Boone's self-harm together with the lack of evidence indicating Mr. Boone even wanted to speak with his therapist. Taken together in its entire context, the evidence falls far short of showing an affirmative act by Detective Walsh rendering Mr. Boone more vulnerable to danger. Ms. Brookins has not established the fourth element of the test. We need not consider the remaining elements. Ms. Brookins cannot prevail on the state-created danger theory as to Detective Walsh's call with Therapist Raysor.

ii.  **Defendant Walsh did not create danger to Mr. Boone with his remarks to other officers about enjoying himself and home remodeling.**

We next ask whether a comment Detective Walsh made about five minutes before Mr. Boone harmed himself caused danger to Mr. Boone. Detective Walsh approached a group of several officers standing about twenty-five or thirty feet away from where Mr. Boone stood on the ledge. Someone asked Detective Walsh, "how you doing?" and said something else indistinguishable. Detective Walsh responded, seemingly sarcastically, "I'm enjoying myself."[417] There is a question of fact as to whether Mr. Boone overheard this comment from where he stood on the bridge. Ms. Brookins argues Detective Walsh made the remark within earshot of Mr. Boone; the City replies Mr. Boone could not have heard the remark due to the crosstalk, traffic noises, and Mr. Boone's shouting.[418] Mindful of our obligation to view the record in the light most favorable to Ms. Brookins and assuming Mr. Boone heard the remark, we find there is no genuine issue of material fact because a reasonable jury could not conclude the remark showed conscious disregard under the second prong of the four-part state-created danger test.

The second prong requires Detective Walsh act with a conscious-shocking degree of culpability.[419] We look to our Court of Appeals's decision in *Haberle v. Troxell* for guidance. There, as here, the intermediate standard requiring a conscious disregard of a great risk of serious harm applied; the Court found Officer Troxell's decision to knock on the apartment door of a suicidal person instead of waiting for crisis negotiators fell "beneath the threshold of conscious disregard."[420] If a knock on an apartment door directed at a suicidal individual does not constitute conscious disregard, we cannot find the passing remark of an officer not involved with negotiations with Mr. Boone meets the threshold.

"[O]ur cases have repeatedly acknowledged that executive action violates substantive due process only when it shocks the conscience but that the meaning of this standard varies depending on the factual context."[421] Different facts might have given rise to liability for state-created danger.[422] But these facts do not. The same goes for the conversations Detective Walsh had about house remodeling just before Mr. Boone jumped from the bridge. A side conversation between officers on the scene, even if it should have waited for a more appropriate time, does not establish conscious disregard of a great risk of serious harm. We need not reach the other prongs of the state-created danger doctrine because Detective Walsh's remarks do not shock the conscience. Ms. Brookins cannot prevail on her substantive due process claim arising from Detective Walsh's inappropriate remarks.

### iii.    Inspector Luca did not create danger to Mr. Boone with his unspecified acts.

We next examine Inspector Luca's conduct causing Mr. Boone to become "increasingly agitated."[423] Ms. Brookins does not identify a specific statements by Inspector Luca; she relies upon certain commentary by the officer wearing the body camera concerning Inspector Luca's tactics and Mr. Boone's inquiry of "why things were becoming 'hostile.'"[424] There is no dispute Mr. Boone and Officer Andrews talked about Inspector Luca's negotiation strategies, but we agree with the City Ms. Brookins does not cite record evidence supporting her argument Inspector Luca "affirmatively made the situation worse[.]"[425] Without knowing what Inspector Luca said to Mr. Boone, a reasonable jury could not find Inspector Luca foreseeably and directly caused Mr. Boone's harm in a way which shocks the conscience and rendered Mr. Boone more vulnerable to danger. Ms. Brookins's counsel admitted he could offer no specific example but asked we review all of the bodycam footage. We did once again. Ms. Brookins has not provided sufficient evidence of a genuine issue of material fact precluding judgment as a matter of law based on Inspector

Luca's unidentified statements. She cannot prevail on her state-created danger against Inspector Luca.

We grant summary judgment in favor of Detective Walsh and Inspector Luca on Ms. Brookins's Fourteenth Amendment state-created danger claim. The absence of an underlying constitutional violation is fatal to Ms. Brookins's wrongful death claim arising from the officers' pre-fall conduct, so we grant summary judgment on this claim too.[426]

### E. We grant summary judgment in favor of the City on the municipal liability claim alleging a failure to train police officers how to deal with individuals undergoing mental health crises.

The City moves for summary judgment on the merits of Ms. Brookins's *Monell* claim alleging a failure to train police officers how to engage with individuals in crisis.[427] "To make out a failure to train claim, plaintiff must prove the inadequate training amounted to a 'deliberate indifference to the rights of persons with whom the police come into contact.'"[428] "Formalistically, the elements of a *Monell* failure to train theory are (1) an underlying constitutional violation (here, state created danger, which requires deliberate indifference of the municipality) (2) to which the municipality was deliberately indifferent."[429]

We need not address the parties' failure to train arguments because Ms. Brookins did not establish state-created danger to Mr. Boone arising from the officers' pre-fall conduct. Without an underlying constitutional violation, her related *Monell* theory necessarily fails. The City is entitled to judgment on the state-created danger *Monell* claim.

## III.    Conclusion

We today review Philadelphia Police officers' behavior toward a mentally ill suicidal person both before and after his self-harm. Several colleagues offer persuasive guidance on police officers' potential liability for allegedly agitating a man suffering a severe mental health episode

who later harms himself. Recently produced body camera footage confirms no genuine issue of material fact concerning the constitutionality of the officers' interactions with the distressed man before he harmed himself.

Officer Culver using his personal cell phone to photograph a fatally injured person to share with friends is shocking reprehensible conduct. But we (and the officers) lack established guidance on whether a police officer violates a mother's privacy rights when the officer inexcusably circulates a cellphone photograph of her critically wounded mentally ill son on the ground after he harmed himself. We find Officer Culver's conduct violated the mother's constitutional privacy rights. But the reckless officer is entitled to qualified immunity as there is no clearly established privacy right and Ms. Brookins does not argue his conduct is so outrageous to allow us to find any police officer would know photographing a victim and circulating it violates a family member's privacy rights. The officer's conduct is inexcusable and unworthy of the trust we place in our police. It is also unprecedented in the law. So, the reckless officer is entitled to judicially created qualified immunity. Our holding does not excuse the officer's conduct.

Ms. Brookins also adduced no evidence the City's failure to train its officers resulted in Officer Culver's reckless and reprehensible conduct. Nor has the mother adduced medical evidence establishing his shocking circulation of the photograph caused her severe emotional distress.

We grant the Defendants' motions for summary judgment.

---

[1] ECF 106 (Culver Statement of Undisputed Material Facts ("SUMF")) ¶ 1; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 1. Ms. Brookins's Response to Officer Culver's Statement of Undisputed Material Facts, her Response to the City's Statement of Undisputed Material Facts, and her Counterstatement of Undisputed Material Facts ("CUMF") are all located at ECF 118. Her Response to Officer Culver's SUMF can be found at ECF 118 at 13–20. Her Response to the City's

SUMF can be found at ECF 118 at 1–13. Ms. Brookins's CUMF can be found at ECF 118 at 21–39.

[2] ECF 106 (Culver SUMF) ¶ 5; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 5.

[3] ECF 106 (Culver SUMF) ¶ 6; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 6. Mr. Boone stood approximately where the blue highlight is on the map for most of the time before he moved to the right of the picture where the unfenced portion of the ledge begins.

[4] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[5] ECF 106 (Culver SUMF) ¶ 17; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 17.

[6] ECF 106 (Culver SUMF) ¶¶ 13, 18; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 13, 18.

[7] ECF 106 (Culver SUMF) ¶¶ 15, 19; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 15, 19.

[8] ECF 109 (City SUMF) ¶¶ 83; ECF 118 (Brookins Resp. to City SUMF) ¶¶ 83.

[9] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182); ECF 109 (City SUMF) ¶ 83; ECF 118 (Brookins Resp. to City SUMF) ¶ 83.

[10] ECF 109 (City SUMF) ¶ 135; ECF 118 (Brookins Resp. to City SUMF) ¶ 135.

[11] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[12] ECF 106 (Culver SUMF) ¶ 7; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 7. Officer Andrews was the only officer on scene with a body camera. *See id.*

[13] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[14] *See generally id.*

[15] *See generally id.*

[16] *See generally id.*; ECF 118 (Brookins CUMF) ¶¶ 46–47.

[17] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[18] *See generally id.*

[19] *See generally id.*

[20] *See generally id.*; ECF 118 (Brookins CUMF) ¶ 43.

[21] *See generally* JA182 (Body Camera Footage); ECF 106 (Culver SUMF) ¶ 21; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 21.

[22] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182); ECF 106 (Culver SUMF) ¶ 22; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 22.

[23] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[24] *See generally id.*

[25] *See generally id.*; ECF 106 (Culver SUMF) ¶ 24; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 24.

[26] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[27] *See generally id.*; ECF 106 (Culver SUMF) ¶ 23; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 23.

[28] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[29] *See generally id.*

[30] *See generally id.*; ECF 106 (Culver SUMF) ¶¶ 25, 26; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 25, 26.

[31] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[32] *See generally id.*

[33] *See generally id.*

[34] *See generally id.*

[35] *See generally id.*

[36] *See generally id.*

[37] *See generally id.*

[38] *See generally id.*; ECF 118 (Brookins CUMF) ¶¶ 49–50.

[39] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182); ECF 118 (Brookins CUMF) ¶ 52.

[40] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182); ECF 118 (Brookins CUMF) ¶ 53.

[41] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182); ECF 118 (Brookins CUMF) ¶ 54.

[42] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[43] *See generally id.*

[44] *See generally id.*

[45] *See generally id.*

[46] *See generally id.*

[47] *See generally id.*

[48] *See generally id.*; ECF 118 (Brookins CUMF) ¶ 64.

[49] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[50] *See generally id.*

[51] *See generally id.*

[52] *See generally id.*

[53] *See generally id.*

[54] *See generally id.*

[55] *See generally id.*

[56] *See generally id.*

[57] *See generally id.*

[58] *See generally id.*

[59] *See generally id.*

[60] *See generally id.*

[61] *See generally id.*

[62] *See generally id.*

[63] *See generally id.*

[64] *See generally id.*

[65] *See generally id.*

[66] *See generally id.*

[67] *See generally id.*; ECF 118 (Brookins CUMF) ¶ 65.

[68] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[69] *See generally id.*, ECF 118 (Brookins CUMF) ¶ 66.

[70] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182); ECF 118 (Brookins CUMF) ¶ 68.

[71] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[72] *See generally id.*

[73] *See generally id.*

[74] *See generally id.*

[75] *See generally id.*

[76] *See generally id.*

[77] *See generally id.*; ECF 118 (Brookins CUMF) ¶ 69.

[78] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182)

[79] *See generally id.*; Though it is readily apparent from the footage Mr. Boone jumped from the overpass, counsel for Ms. Brookins swore in the operative Complaint Mr. Boone "fell" from the overpass. *See* ECF 93. He did not fall. He dove headfirst like a diver into a pool.

[80] ECF 106 (Culver SUMF) ¶ 31; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 31.

[81] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182). We remain concerned how counsel for all parties repeatedly represented Mr. Boone died upon impact such that Officer Culver took a picture of a deceased Mr. Boone. We notified counsel during oral argument of our concern with the repeated lack of candor on this issue even though we find the distinction immaterial as a matter of privacy law.

[82] ECF 106 (Culver SUMF) ¶ 34; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 34.

[83] ECF 106 (Culver SUMF) ¶ 36; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 36; ECF 120-1 (Culver Aff., PA2324) at 2.

[84] ECF 106 (Culver SUMF) ¶ 48; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 48.

[85] ECF 106 (Culver SUMF) ¶ 39; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 39.

[86] ECF 106 (Culver SUMF) ¶ 41; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 41.

[87] ECF 106 (Culver SUMF) ¶¶ 42–43; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 42–43.

[88] ECF 106 (Culver SUMF) ¶¶ 44–45; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 44–45.

[89] ECF 106 (Culver SUMF) ¶ 45; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 45.

[90] ECF 106 (Culver SUMF) ¶ 46; ECF 118 (Brookins Resp. to Culver SUMF) ¶ 46.

[91] ECF 118 (Brookins CUMF) ¶¶ 76–130.

[92] ECF 118 (Brookins CUMF) ¶ 76.

[93] *Id.* ¶ 85.

[94] *Id.* ¶¶ 126–130 (Ms. Brookins spoke with an unknown police officer from the City of Philadelphia Police Northeast Detectives on an unidentified date); *see also* ECF 119-7 (Brookins Aff., PA1512–PA1517) at 50 ¶ 8 (Ms. Brookins called the 8th District on March 19, 2022 and spoke to a woman named Mary).

[95] ECF 106 (Culver SUMF) ¶¶ 47–50; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 47–50.

[96] ECF 106 (Culver SUMF) ¶¶ 51–52; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 51–52.

[97] ECF 106 (Culver SUMF) ¶¶ 53–53; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 53–55.

[98] ECF 106 (Culver SUMF) ¶¶ 58–59; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 58–59.

[99] ECF 106 (Culver SUMF) ¶¶ 51–52; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 51–52.

[100] ECF 1.

[101] ECF 109 (City SUMF) ¶ 151; ECF 118 (Brookins Resp. to City SUMF) ¶ 151.

[102] ECF 118 (Brookins CUMF) ¶¶ 6–7, 71.

[103] *Id.* ¶ 71.

---

[104] ECF 109 (City SUMF) ¶¶ 154–55; ECF 118 (Brookins Resp. to City SUMF) ¶¶ 154–55.

[105] ECF 118 (Brookins CUMF) ¶¶ 131–33.

[106] ECF 119 at 2 n.2.

[107] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Servs.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533–34 (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23. "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323.

[108] *Morton v. Lancaster Cnty. Prison*, No. 13-1306, 2014 WL 3953175, at *10 (E.D. Pa. Aug. 11, 2014) (quoting *Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir. 1996)), *aff'd sub nom. Morton v. Arnold*, 618 Fed. App'x 136 (3d Cir. 2015)).

[109] *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011) (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 178 (3d Cir. 2005)).

[110] *Id.* (quoting *C.N.*, 430 F.3d at 178).

[111] *Morton*, 2014 WL 3953175, at *10.

[112] *Malleus v. George*, 641 F.3d 560 (3d Cir. 2011) (quoting *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000)), *as amended* (June 6, 2011).

[113] *Luzerne*, 660 F.3d at 175 (quoting *Malleus*, 641 F.3d at 564).

[114] *Id.* (first citing *Fraternal Order of Police, Lodge No. 5 v. City of Phila.*, 812 F.2d 105, 112 (3d Cir. 1987); then citing *Malleus*, 641 F.3d at 564; and then citing *C.N.*, 430 F.3d at 179).

[115] *Id.* at 176 (quoting *Nunez v. Pachman*, 578 F.3d 228, 232 (3d Cir. 2009)).

[116] 680 F.3d 1148, 1154 (9th Cir. 2012) (quoting *Whalen v. Roe*, 429 U.S. 589, 599 (1977)).

[117] *Id.* at 1152.

[118] *Id.*

[119] *Id.*

[120] *Id.* at 1154 (quoting *Rochin v. Cal.*, 342 U.S. 165, 172–73 (1952)).

[121] *Id.* at 1154–55.

[122] 541 U.S. 157 (2004).

[123] *Id.* at 165–67.

[124] *Id.* at 167–69.

[125] *Marsh*, 680 F.3d at 1154 (emphasis added). Because the right was not clearly established at the time of the district attorney's conduct the court found he had qualified immunity. *Id.* at 1158–60 (citing *Davis v. Scherer*, 468 U.S. 183, 191 (1984)).

[126] ECF 105 at 9–17.

[127] *Id.* at 11.

[128] *Id.* at 11–13. Officer Culver argues a "photograph of Mr. Boone does not implicate Ms. Brookins' privacy interest in her own 'sexual information, medical information, [or] financial information.'" *Id.* at 13.

[129] ECF 117 at 7 (discussing *Doe v. Borough of Barrington*, 729 F. Supp. 376, 382–85 (D.N.J. 1990)).

[130] *See* ECF 31 ("We . . . have little difficulty in rejecting the Officer Defendants' and the City's argument Ms. Brookins only has the right to control information about herself.").

[131] *Marsh*, 680 F.3d at 1154.

[132] ECF 105 at 15.

[133] ECF 117 at 14–16.

[134] Ms. Brookins's former counsel swore in her first Complaint approximately twenty-one months after she knew her son survived the harm on the ground, "[i]n the immediate moments after Mr. Boone's death, John Doe #1 – a Philadelphia Police Officer present at the scene – took photographs of Mr. Boone's deceased body on the ground from the vantage point of where he jumped." ECF 1 ¶ 1 (emphasis added). Ms. Brookins's former counsel swore the same thing in the amended Complaint and the second amended Complaint. ECF 18 ¶ 1; ECF 38 ¶ 1.

[135] ECF 94 at 7; *see also, e.g.*, ECF 87 (Oral Argument Tr.) at 22; ECF 93 (granting Plaintiff leave to amend her Complaint ***only*** to add a pre-fall state-created danger claim and related wrongful death claim).

[136] ECF 93 ¶¶ 51, 53–56 (swearing Officer Culver took a photograph of Mr. Boone instead of rendering necessary medical care), 66–68 (swearing Mr. Boone showed vital signs of life when admitted to the hospital but died despite medical staff's efforts).

[137] ECF 105 at 17 ("The photograph of Mr. Boone was taken while he was alive.").

[138] *Marsh*, 680 F.3d at 1154.

[139] *Id.*

[140] Brookins Dep. I (ECF 107 at 3–68, JA1–JA66) 125:23–126:11. Officer Culver's and the City's combined exhibits are all located at ECF 107, so we use the pagination assigned in their joint appendix in addition to the ECF numbers to refer to their exhibits. Likewise, all of Ms. Brookins's exhibits are located at ECFs 119 and 120, so we use the pagination assigned in her appendix in addition to the ECF numbers when referring to her exhibits.

[141] ECF 105 at 15.

[142] *Id.*

[143] *Id.* at 14.

[144] ECF 117 at 15–18.

[145] *Doe 1 v. Cnty. of Fayette*, No. 14-196, 2014 WL 5493814, at *2 (W.D. Pa. Oct. 30, 2014).

[146] *Id.* (alteration in original) (quoting *C.N.*, 430 F.3d at 179).

[147] *Id.*

[148] *Luzerne*, 660 F.3d at 176.

[149] *Id.* at 175.

[150] *See id*. at 175–76 (first citing *Fraternal Order of Police*, 812 F.2d at 112–13; then citing *Malleus*, 641 F.3d at 564).

[151] ECF 105 at 12 (quoting *Luzerne*, 660 F.3d at 176 n.5).

[152] *Luzerne*, 660 F.3d at 176 n.5. Officer Culver cites to one footnote in *Luzerne* where our Court of Appeals discussed a factually distinguishable case from the Ninth Circuit. In *Davis v. Bucher*, the Court of Appeals for the Ninth Circuit held found no constitutional privacy expectation where an incarcerated person brought photographs of his naked wife into prison because he "imported the photos into the prison environment, a habitat presenting an inherent risk of disclosure and a cognizable diminution in [the prisoner's] reasonable expectations of privacy." 853 F.2d 718, 720 (9th Cir. 1988). Officer Culver does not explain—nor can we surmise—how the scene on a roadside following a suicide attempt presents "an inherent risk of disclosure" akin to the risk of disclosure in *Bucher*.

[153] *Luzerne*, 660 F.3d at 176 n.5.

[154] *United States v. Sczubelek*, 402 F.3d 175, 182 (3d Cir. 2005) (emphasis added) (citing *United States v. Knights*, 534 U.S. 112, 118 (2001)).

[155] *Nunez*, 578 F.3d at 231–32.

[156] *California v. Ciraolo*, 476 U.S. 207, 209–10 (1986); *Oliver v. United States*, 466 U.S. 170, 173–74 (1984).

[157] *In re Grand Jury Proc. (Mills)*, 686 F.2d 135, 136–37 (3d Cir. 1982).

[158] *Ciraolo*, 476 U.S. at 213.

[159] *Oliver*, 466 U.S. at 179.

[160] *Grand Jury Proc.*, 686 F.2d at 139.

[161] ECF 105 at 13.

[162] *Luzerne*, 660 F.3d at 176.

[163] *Id.* at 171.

[164] *Id.* at 172.

[165] *Id.* at 173.

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] *Id.* at 174.

[170] *Id.* at 177.

[171] *Id.* ("We conclude that Doe had a reasonable expectation of privacy while in the Decontamination Area, particularly while in the presence of members of the opposite sex.").

[172] *See Marsh*, 680 F.3d at 1153 n.1 ("This privacy right belongs, not to the deceased, but to the survivors: 'A privilege may be given the surviving relatives of a deceased person to protect his memory, but the privilege exists for the benefit of the living, to protect their feelings, and to prevent a violation of their own rights in the character and memory of the deceased.'" (quoting *Favish*, 541 U.S. at 168–69)).

[173] *Id.* at 1154 (emphasis added).

[174] Even if Mr. Boone's location had some bearing on Ms. Brookins's privacy interest—and we find it does not— there is a question of fact about the public nature of the bridge when Mr. Boone harmed himself. The record contains contradictory evidence on this point. We normally agree a highway overpass is a public place. On the day in question, though, the police attempted to secure a perimeter around the area. The overpass is located at the intersection of Knights Road and Woodhaven Road. *See* ECF 107 (JA205) at 207. Lieutenant Jeffrey Seamen swore he "took steps to ensure that the bridge was closed down[]" and "[t]raffic was closed off on Knights Road both ways. And Woodhaven Road." Seaman Dep. (ECF 107 at 149–55, JA147–JA 153) 12:18–24. When asked about the purpose of the perimeter, Lieutenant Seamen swore, "[t]o make sure no bystanders come by for the safety of the people involved, the person on the bridge, the officers, everyone that has to respond." Seamen Dep. 13:8–11. Sergeant Michael Dougherty similarly swore "there was a ton of bystanders[,]" but "[t]hey weren't exactly within the perimeter. But they were as close as they could get without—where we couldn't move them back any further. . . . They were in parking lots across the street." Dougherty Dep. (ECF 107 at 226–32, JA224–JA230) 16:3–10. Police Officer Dennis Clair swore he had to block the parking lot of a nearby TD Bank because "[t]hey didn't want people going in and . . . watching . . . ." Clair Dep. (ECF 107 at 239–46, JA237–JA244) 8:20–25. Inspector Anthony Luca swore "the perimeter was already established[]" when he arrived at the scene and "[t]he overpass was completely empty except for a few vehicles that was down south of the location. . . . And the entire stretch of Woodhaven Road was also blocked off as well." Luca Dep. (ECF 107 at 272–82, JA270–JA280) 11:13–12:1. When asked whether he believed the perimeter sufficiently kept bystanders out, he said yes. *Id.* 12:15–17.

Despite the perimeters in place there is some evidence one or more bystanders saw Mr. Boone jump. Sergeant Rodden swore "[w]e have a bystander's picture of him jumping." Rodden Dep. (ECF 107 at 292–310, JA290–JA308) 36:8–10. Ms. Brookins also swore witnesses to the incident reached out to her afterward. Brookins Dep I (ECF 107 at 3–68, JA1–JA66) 194:11–200:10. But it is unclear from the testimony whether they actually saw Mr. Boone on the ground, and in any event, we cannot consider hearsay evidence on summary judgment. *Smith v. City of Allentown*,

589 F.3d 684, 693 (3d Cir. 2009). We have no evidence corroborating Ms. Brookins's statements about the persons who may have seen the jump.

The map of the area and the officers' testimony they blocked the roads intersecting the location where Mr. Boone stood confirms all bystanders in nearby parking lots. The body cam footage confirms the bystanders stood far enough away they could not hear Mr. Boone and he could not hear them. *See generally* JA182. It appears on the map the closest parking lots to the overpass are the Dunkin' Donuts, which sits in front and to the left of the overpass when looking at the area from an aerial view, and the TD Bank, which sits behind and to the left of the overpass. Both parking lots are separated from the overpass by a grassy median strip with trees. While it is certainly possible bystanders in the parking lots saw Mr. Boone standing on the overpass, and later, jumping, it is far from clear whether those bystanders would have been able to see him once he hit the ground. So we cannot agree the injuries to Mr. Boone occurred "on a public thoroughfare." ECF 105 at 15.

[175] *See Marsh*, 680 F.3d at 1154.

[176] *Luzerne*, 660 F.3d at 178 (citing *C.N.*, 430 F.3d at 179; *Fraternal Order of Police*, 812 F.2d at 110).

[177] *Id.* (quoting *Fraternal Order of Police*, 812 F.3d at 110).

[178] *Id.* (citing *C.N.*, 420 F.3d at 179–80).

[179] *Marsh*, 680 F.3d at 1155.

[180] ECF 105 at 18–19.

[181] ECF 117 at 19.

[182] *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014)).

[183] *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)).

[184] *Montemuro v. Jim Thorpe Area Sch. Dist.*, 99 F.4th 639, 645 (3d Cir. 2024).

[185] *Mack v. Yost*, 63 F.4th 211, 231 (3d Cir. 2023) (quoting *Peroza-Benitez*, 994 F.3d at 165).

[186] *Rivas-Villegas*, 595 U.S. at 7–8 (quoting *Pauly*, 580 U.S. at 79).

[187] *District of Columbia v. Wesby*, 583 U.S. 48, 66 n.8 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 665–666 (2012)).

[188] *Rivas-Villegas*, 595 U.S. at 5 ("Even assuming that controlling Circuit precedent clearly establishes law for purposes of § 1983, *LaLonde* did not give fair notice to Rivas-Villegas.").

[189] *James v. N.J. State Police*, 957 F.3d 165, 170 (3d Cir. 2020) (first quoting *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018); then citing *Wesby*, 583 U.S. at 63)).

[190] *Peroza-Benitez*, 994 F.3d at 165–66.

[191] *Mack*, 63 F.4th at 228 (quoting *Jefferson v. Lias*, 21 F.4th 74, 81 (3d Cir. 2021)).

[192] *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

[193] *Rivas-Villegas*, 595 U.S. at 5–6 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

[194] *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011).

[195] *Id.* at 330 (first quoting *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846 (7th Cir. 1990); then citing *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009)).

[196] ECF 105 at 18. An initial problem: Officer Culver's framing of the constitutional right relies on the erroneous premise Mr. Boone's location before and at the time of the photo somehow impacts Ms. Brookins's privacy right.

[197] *City of Escondido*, 586 U.S. at 42 (quoting *Kisela*, 584 U.S. at 104).

[198] *Id.* at 42–43.

[199] *Jefferson*, 21 F.4th at 81.

[200] *Id.*

[201] *Whalen*, 429 U.S. at 599.

[202] ECF 105 at 18.

[203] *Marsh*, 680 F.3d at 1154.

[204] *See Favish*, 541 U.S. 157 (FOIA); *Catsouras v. Dep't of Cal. Highway Patrol*, 104 Cal. Rptr. 3d 352 (Cal. Ct. App. 2010) (state law invasion of privacy); *Sellers v. Henry*, 329 S.W.2d 214 (Ky. 1959) (state law invasion of privacy); *Melton v. Bd. of Cnty. Comm'rs of Hamilton Cnty., Ohio*, 267 F. Supp. 2d 859 (S.D. Ohio 2003) (state law invasion of privacy); *New York Times Co. v. Nat'l Aeronautics & Space Admin.*, 782 F. Supp. 628 (D.D.C. 1991) (FOIA); *The New York Times Co. v. City of New York Fire Dep't*, 829 N.E.2d 266 (N.Y. 2005) (New York's Freedom of Information Law); *Katz v. Nat'l Archives & Records Admin.*, 862 F. Supp. 476 (D.D.C. 1994) (FOIA).

[205] *Peroza-Benitez*, 994 F.3d at 165 (quoting *Fields v. City of Phila*., 862 F.3d 353, 361 (3d Cir. 2017)).

[206] *Lamorie v. Davis*, 485 F. Supp. 3d 1065, 1070–73 (D. Ariz. 2020) (recognizing the right to privacy in death images and the right to control a child's remains where a Department of Child Services investigator did not inform a father his daughter was removed from life support and cremated but finding the investigator's conduct did not shock the conscience because there was no publication of an autopsy photo or mutilation of a body); *Jones v. Jinparn*, No. 19-2817, 2020 WL 999806, at *4 (N.D. Cal. Mar. 2, 2020) (recognizing the right to control the physical remains and images of a deceased child where police released a body to a funeral home without contacting the decedent's heirs but finding the officer's conduct did not shock the conscience); *Roberts v. Bell*, 281 F. Supp. 3d 1074, 1085 (D. Mont. 2018) (recognizing the right to privacy in death photographs where a daughter sued a sheriff who took photographs of a car accident scene involving the plaintiff's mother and posted them on Facebook but finding the sheriff's behavior did not shock the conscience because a tarp covered the mother); *Shelley v. Cnty. of San Joaquin*, No. 13-266, 2017 WL 4547055, at *6–*8 (E.D. Cal. Oct. 12, 2017) (recognizing the right to control the remains of a child where county exhumed remains of plaintiff's daughter during excavation project and finding plaintiff had "identified conduct which implicates behavior sufficiently conscience-shocking to survive summary judgment"); *Lee v. City of Seattle*, No. 75815–2–I, 2018 WL 2203287, at *1 (Wash. Ct. App. May 14, 2018) (recognizing the right to privacy in death images and affirming trial court order enjoining the city from releasing death scene photographs of Kurt Cobain). *But see Olejnik v. England*, 147 F. Supp. 3d 763, 777–78 (W.D. Wis. 2015) (declining to recognize the right to non-interference with a family's remembrance of a decedent where medical examiner took home human specimens to train a cadaver dog because "the *Marsh* holding represents an expansion in substantive due process law not augured in Seventh Circuit precedent" and because plaintiff family members' privacy rights were not implicated as the medical examiner did not publicly display information about the decedent's death or autopsy); *Pauly v. Vasquez*, No. 15-783, 2016 WL 9443732, at *6 (D.N.M. Aug. 10, 2016) (discussing *Marsh* but finding qualified immunity because the constitutional right was not clearly established in 2011 and *Marsh*, an opinion from another circuit, could not clearly establish the law of the Tenth Circuit). We also acknowledge Judge Golden's 2007 analysis in *Werner v. Cnty. of Northampton* analyzing facts like those before us, but the citizen in *Werner* did not bring a substantive due process privacy claim—he brought other constitutional claims and a state law invasion of privacy claim. No. 07-1910, 2007 WL 4553702, at *2–*4 (E.D. Pa. Dec. 19, 2007).

[207] *Doe v. Delie*, 257 F.3d 309, 321 n.10 (3d Cir. 2001) (discussing *Pro v. Donatucci*, 81 F.3d 1283, 1288–89 (3d Cir. 1996)).

[208] *Donatucci*, 81 F.3d at 1288–89 (emphasis added) ("The court also relied on two district court decisions **within this circuit** that have followed the approach of the Court of Appeals for the Fifth Circuit.").

[209] ECF 108 at 11. The City also moves for summary judgment on behalf of the named officers arguing a lack of personal involvement, *see id.* at 9, but we need not address this argument as Ms. Brookins in her opposition brief dismissed all individual officers besides Officer Culver from her privacy claim. *See* ECF 119 at 2 n.1.

[210] *Hargrove v. City of Phila.*, 671 F. Supp. 3d 595, 605 (E.D. Pa. 2023) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978)).

[211] *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)).

[212] *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citing *Estate of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019)).

[213] *Id.* at 105 (citation omitted) (quoting *Estate of Roman*, 914 F.3d at 798).

[214] *See Forrest*, 930 F.3d at 105.

[215] *See* ECF 119 at 17–24. The Police Department has a policy prohibiting use of cell phones at crime scenes, but Ms. Brookins does not argue the policy itself is unconstitutional. She attaches Philadelphia Police Department Directive 4.1 ("Responsibilities at Crime Scenes") as one of her exhibits. *See* ECF 119-7 (Directive 4.1, PA1480–1500) at 18. Under Section 1(F) of this policy, privately-owned cell phones may "only be used in exigent circumstances whenever departmental equipment is unavailable and there is no other means to record the item or event." *Id.* We note the effective date of the attached policy is June 17, 2022—three months after the March 18, 2022 incident with Mr. Boone. But the Philadelphia Police Department did have a crime scene policy in place at the time of the incident because Lieutenant James Miller, who conducted the internal affairs investigation, concluded Officer Culver "was sustained for a violation of a crime scene, from taking photos at that crime scene[]" when asked whether Officer Culver violated police directives. Miller Dep. (ECF 107 at 190–200, JA188–JA198) 18:21–19:2.

Officer Culver also swore he did not consider the scene of Mr. Boone's body as a crime scene, so the crime scene directive is inapplicable. Culver Dep. (ECF 107 at 137–48, JA 135–JA146) 26:3–24. Ms. Brookins does not offer an argument based on this testimony.

[216] *Forrest*, 930 F.3d at 106.

[217] *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997)).

[218] *Id.* at 63–64 (quoting *Bryan*, 520 U.S. at 409).

[219] *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1028 (3d Cir. 1991) (alterations in original) (quoting *City of Canton*, 489 U.S. at 391).

[220] *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014) (quoting *Colburn*, 946 F.2d at 1029–30).

[221] *Id.* (alteration in original) (quoting *City of Canton*, 489 U.S. at 391).

[222] *City of Canton*, 489 U.S. at 391.

[223] *Sacko v. Univ. of Pa.*, No. 14-831, 2014 WL 2547802, at *3 (E.D. Pa. June 6, 2014) (quoting *City of Canton*, 489 U.S. at 390–91).

[224] ECF 108 at 10. We note it would typically be difficult for a party to show it is entitled to summary judgment when it leaves inadvertent placeholders "(Insert a citation to any evidence of public watching)" instead of citations to the record. *Id.*

[225] *See supra* Part II(A)(3). We are, however, perplexed by the City's argument a parent only has a privacy interest in the photo of a deceased child, and not the photo of a deceased adult, because parents have the authority to restrict photos of minor children but not adult children. ECF 108 at 9. It is true parents cannot control photographs of their adult children, but if the adult child is ***deceased***, any autonomy the adult child once had over photos of himself is—obviously—gone.

[226] ECF 108 at 12.

[227] *Id.*

[228] *Id.* at 13.

[229] ECF 119 at 4, 23.

[230] *See id.* at 23–24. Ms. Brookins refers to her expert as "Dr. Thomas." *Id.* at 23. Dr. Chapman in fact wrote the expert report. *See* 119-6 (Expert Report, PA410–PA493) at 1–84.

[231] ECF 119 at 4.

[232] Rivera Dep. (ECF 107 at 368–77, JA366–JA375) 17:19–21.

[233] *Id.* at 17:24–18:15.

[234] *Id.* at 22:23–23:11.

[235] *Id.* at 23:12–15.

[236] Miller Dep. (ECF 107 at 190–200, JA188–JA198) 29:10–22.

[237] Culver Dep. (ECF 107 at 137–48, JA 135–JA146) 25:24–26:2.

[238] *Id.* 4:14–19.

[239] Clair Dep. (ECF 107 at 239–46, JA237–JA244) 14:18–23.

[240] Squares Dep. (ECF 107 at 255–61, JA253–259) 15:18–16:3.

[241] Andrews Dep. (ECF 107 at 336–67, JA334–JA365) 10:4–16.

---

[242] Singletary Dep. (ECF 107 at 262–71, JA260–JA269) 24:7–20.

[243] Luca Dep. (ECF 107 at 272–82, JA270–JA280) 26:4–9.

[244] Rovnan Dep. (ECF 107 at 324–35, JA322–JA333) 35:17.

[245] *Colburn*, 946 F.2d at 1030. Our Court of Appeals in *Colburn* found a township policy "was not unmindful of the risk of detainee suicide; nor did its training program fail to communicate to its custodians the importance of suicide prevention." *Id.* Rather, "everyone associated with the jail knew . . . the City's policy" and the implementation of the policy was "relatively efficacious[.]" *Id.*

[246] Bachmayer Dep. (ECF 107 at 106–17, JA104–JA115) 13:13–14:6.

[247] Deblasis Dep. (ECF 107 at 283–91, JA281–JA 289) 18:4–19.

[248] Rovnan Dep. (ECF 107 at 324–35, JA322–JA333) 33:9–11, 24–25.

[249] *Id.* 33:18–20.

[250] Luca Dep. (ECF 107 at 272–82, JA270–JA280) 26:16–21.

[251] *Id.* 27:13–25.

[252] Andrews Dep. (ECF 107 at 336–67, JA334–JA365) 9:23–10:2.

[253] *Jordan v. Penn. State Univ.*, 276 A.3d 751, 775 (Pa. Super. Ct. 2022).

[254] ECF 105 at 26.

[255] *Id.*

[256] ECF 117 at 20.

[257] *Id.* at 21.

[258] ECF 121 at 7-9.

[259] 527 A.2d 988 (Pa. 1987).

[260] *Id.* at 995.

[261] *Id.*

[262] ECF 121 at 7.

263 *Gray v. Huntzinger*, 147 A.3d 924, 929 n.4 (Pa. Super. Ct. 2016).

264 ECF 117 at 21.

265 *Brenner v. Consolidated Rail Corp.*, 806 F. Supp. 2d 786, 791 (E.D. Pa. 2011).

266 *Id.* at 790 & n.4.

267 *Id.* at 790 n.4.

268 *Id.* at 790.

269 Id. at 790–91.

270 *Id.* at 791.

271 *Id.* at 790 n.4.

272 *Schweikert v. Eagle*, No. 20-4310, 2022 WL 394751, at *4–*6 (E.D. Pa. Feb. 9, 2022).

273 *Id.* at *4.

274 *Id.*

275 *Id.* (first citing *Evans v. Capital Blue Cross*, No. 19-497, 2021 WL 825764, at *6 (M.D. Pa. March 4, 2021); then citing *Mracek v. Bryn Mawr Hosp.*, 610 F. Supp. 2d 401, 406 (E.D. Pa. 2009)).

276 *Id.* (quoting *Pease v. Lycoming Engines*, No. 10-843, 2012 WL 162551 at *13 (M.D. Pa. Jan. 19, 2012)).

277 *Id.* (quoting *Pease*, 2012 WL 162551 at *13).

278 *Id.* (quoting *Pease*, 2012 WL 162551 at *13).

279 *Celotex*, 477 U.S. at 325.

280 ECF 105 at 26.

281 Fed. R. Civ. P. 56(c)(1)(A); *Willis*, 808 F.3d at 643 (once the moving party demonstrates the record presents no genuine issue of material fact, the nonmoving party must identify facts in the record enabling her to make a sufficient showing on essential elements of her case for which she has the burden of proof).

282 Because we conclude Ms. Brookins does not meet her burden on the causation requirement, we need not address Officer Culver's second argument his conduct is not "outrageous." But we note

there are few things we can think of more outrageous than a police officer taking a photograph of a near-dead individual post suicide attempt and circulating this private photo amongst friends in his police department. He demonstrated a complete lack of judgment and discretion we expect in our police.

[283] ECF 77.

[284] ECF 86; ECF 94 at 11–14. If proven, the fraudulent concealment doctrine equitably tolls the statute of limitations on Ms. Brookins's claims challenging the actions on the overpass although the claims do not relate back to her initial Complaint under Federal Rule of Civil Procedure 15.

[285] ECF 108 at 15.

[286] *Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987) (quoting *Schaffer v. Larzelere*, 189 A.2d 267, 269 (1963)).

[287] *Id.* (first citing *Walters v. Ditzler*, 227 A.2d 833, 835 (1967); then citing *Nesbitt v. Erie Coach Co.*, 204 A.2d 473, 476 (1964)).

[288] *Krapf v. St. Luke's Hosp.*, 4 A.3d 642, 650 (2010) (alterations in original) (quoting *Lange v. Burd*, 800 A.2d 336, 339 (Pa. Super. Ct. 2002)).

[289] *Id.* (citing *Lange*, 800 A.2d at 339).

[290] *Molineux*, 532 A.2d at 794 (citing *Schaffer*, 189 A.2d at 269).

[291] *Id.* ("[T]he burden of proving such fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party." (citing *Nesbitt*, 204 A.2d at 475)).

[292] *Krapf*, 4 A.3d at 650 (quoting *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005)).

[293] ECF 108 at 15.

[294] *Id.* at 15.

[295] *Id.* at 15–16.

[296] *Id.* at 16.

[297] *Id.* at 16.

[298] ECF 119 at 11.

[299] *Id.* at 7–10.

[300] *Id.* at 10.

[301] *Id.* at 11; ECF 106 (SUMF) ¶ 62.

[302] ECF 119 at 10.

[303] The Pennsylvania Supreme Court directs "it is for the jury to say whether the remarks that are alleged to constitute the fraud or concealment were made." *Krapf,* 4 A.3d at 650 (quoting *Fine,* 870 A.2d at 860).

[304] ECF 119 at 8–10. The City asserts an argument in its reply brief about the illegality of the recorded conversation with Lieutenant Seamen, *see* ECF 127 at 4–5, but we find it unnecessary to reach this issue because our holding on fraudulent concealment does not concern Lieutenant Seamen.

[305] The City argues fraudulent concealment requires each individual state actor actively mislead Ms. Brookins. ECF 108 at 15; ECF 127 at 4. This argument is unpersuasive because Ms. Brookins also sued the City—not just Defendants Luca and Walsh—for causing state-created danger, ECF 93 ¶¶ 162–75, and Ms. Brookins swore city employees (officers and personnel) lied about the footage. We do not find it consequential the claims against the City are brought under *Monell.* We think our approach is consistent with Pennsylvania courts. For example, in *Krapf v. St. Luke's Hospital,* the estates of five deceased hospital patients sued the hospital and a nurse named Charles Cullen under the wrongful death and survivor acts. 4 A.3d 642 (Pa. Super. Ct. 2010). The Pennsylvania Superior Court affirmed the denial of summary judgment holding the hospital's misleading death certificates offered clear and convincing evidence of fraudulent concealment sufficient to toll the statute of limitations. *Id.* at 650–54. Neither the trial court nor the superior court required the plaintiffs produce separate evidence showing Nurse Cullen fraudulently concealed the causes of death.

[306] 610 F.2d 1157, 1162 (3d Cir. 1979).

[307] *Id.* at 1161–62 (citing *Nesbitt,* 204 A.2d at 476).

[308] *Id.* at 1162.

[309] *Id.* at 1163.

[310] Even if the City's position is that only officers who wear body cameras have permission to give the footage to members of the public—which is implied but not entirely clear from the City's briefing—this argument strains credulity and has no support in the record. *See* ECF 108 at 16 ("[E]ven if she requested BWC [body worn camera footage] from specific Defendant Officers, there was no BWC that could have been provided to Plaintiff because they did not exist.").

[311] ECF 118 (Brookins CUMF) ¶ 13.

[312] ECF 1.

---

[313] ECF 108 at 15–16.

[314] ECF 119-7 (Brookins Notes, PA1502–PA1507) at 39. Ms. Brookins's Counterstatement of Undisputed Material Facts to the City misrepresents what Ms. Brookins wrote in her own notes from the phone call. Ms. Brookins's notes indicate Detective Walsh told her "Marcus's therapist *was on the phone with Marcus* trying to help get him down." *Id.* (emphasis added). By contrast, Ms. Brookins in her CUMF to the City states, "Detective Walsh told Ms. Brookins that he had the therapist from Gaudenzia House on the phone but 'Marcus refused to comply and would not speak to the therapist." ECF 119-2 (Pl.'s CUMF to City) ¶ 81. Ms. Brookins in her CUMF cites to Ms. Brookins's typed notes at PA1502 (which, as we just noted, say something different entirely). Ms. Brookins's CUMF also contradicts her deposition testimony where she swore Detective Walsh "told [her] that he allowed [her] son to talk to his therapist at Gaudenzia House." Brookins Dep. I (ECF 107 at 3–68, JA1–JA66) 119:10–11. We attribute this discrepancy in the CUMF to a mistake by Ms. Brookins's counsel. Indeed, during oral argument, Ms. Brookins's counsel represented the record did not reflect Detective Walsh ever told Ms. Brookins Therapist Raysor spoke to Mr. Boone.

[315] There is no dispute, however, as to whether Therapist Raysor *actually spoke* to Mr. Boone. The body camera footage does not show Mr. Boone taking a phone call at any point on the bridge.

[316] Walsh Dep. (ECF 107 at 118–36, JA116–JA134) 66:2–22.

[317] ECF 119 at 16–17.

[318] Ms. Brookins's counsel adduced facts suggesting the officers refused to let Mr. Boone's therapist speak to him during discovery this Fall from the body camera footage produced on August 20, 2024 and/or from deposing the officers.

[319] Although Ms. Brookins learned body camera footage existed in April 2024, she would not have known of the substantive due process claim arising from the officers' overpass conduct until she received the footage in August 2024. We acknowledge eyewitnesses informed Ms. Brookins shortly after the incident police appeared to be arguing with Mr. Boone on the overpass. ECF 106 (Culver SUMF) ¶¶ 51–52; ECF 118 (Brookins Resp. to Culver SUMF) ¶¶ 51–52. But we have no basis to find Ms. Brookins could have known she had a claim arising from pre-harm conduct until she knew what the officers and Mr. Boone acted during their few hours together.

[320] ECF 108 at 17.

[321] ECF 119 at 15–17.

[322] *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006).

[323] *Id.* (quoting *Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003)).

[324] *Id.*

[325] *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir.1996)).

[326] *Bright*, 443 F.3d at 281.

[327] *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017) (first alteration in original) (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)).

[328] *Sanford*, 456 F.3d at 309.

[329] *Id.* at 309–10.

[330] *Kedra*, 876 F.3d at 437 (quoting *Sanford*, 456 F.3d at 310).

[331] We are assisted by a recent law review article helpfully collecting and discussing many of the cases on state-created danger in the suicide context. Brittany White, *The Law's Role in Ending the Suicide Crisis: Liability for Suicide Under the State-Created Danger Doctrine*, 75 SMU L. REV. 887 (2022).

[332] 456 F.3d 298 (3d Cir. 2006).

[333] *Id.* at 301 (emphasis removed).

[334] *Id.* at 302.

[335] *Id.*

[336] *Id.*

[337] *Id.*

[338] *Id.*

[339] *Id.*

[340] *Id.* at 303.

[341] *Id.* at 304–12.

[342] *Id.* at 309–11.

[343] *Id.* at 311.

[344] *Id.*

[345] *Id.* at 312 (quoting *Bright*, 443 F.3d at 284).

[346] 159 F.3d 1253 (10th Cir. 1998).

[347] *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 918 (10th Cir. 2012).

[348] *Armijo*, 159 F.3d at 1256.

[349] *Id.*

[350] *Id.* at 1257.

[351] *Id.* at 1256–57.

[352] *Id.* at 1257.

[353] *Id.*

[354] *Id.* at 1260–64.

[355] *Id.* at 1264.

[356] 885 F.3d 170, 174 (3d Cir. 2018).

[357] *Id.*

[358] *Id.*

[359] *Id.*

[360] *Id.* (first alteration in original).

[361] *Id.*

[362] *Id.* at 174–75.

[363] *Id.* at 177.

[364] *Id.* at 178.

[365] *Wilson v. Gregory*, 3 F.4th 844, 859 (6th Cir. 2021) (first citing *Cutlip v. City of Toledo*, 488 Fed. App'x 107, 115 (6th Cir. 2012); then citing *Jahn v. Farnsworth*, 617 Fed. App'x 453, 463 (6th Cir. 2015)).

[366] 488 F. App'x 107, 108–09 (6th Cir. 2012).

[367] *Id.* at 109–10.

[368] *Id.* at 110.

[369] *Id.*

[370] *Id.*

[371] *Id.*

[372] *Id.*

[373] *Id.* at 110–11.

[374] *Id.* at 115–16.

[375] *Id.* at 116.

[376] *Id.* at 117.

[377] *Id.* at 117–18.

[378] *Id.* at 118.

[379] *Id.* at 119.

[380] *Id.*

[381] *Id.*

[382] 175 F.3d 68, 69–70 (1st Cir. 1999).

[383] *Id.* at 73.

[384] 659 F.3d 37, 38–39 (1st Cir. 2011).

[385] *Id.* at 39.

[386] *Id.* at 40.

[387] *Martin v. Shawano-Gresham Sch. Dist*., 295 F.3d 701, 704–05 (7th Cir. 2002); *Collignon v. Milwaukee Cnty*., 163 F.3d 982, 984 (7th Cir. 1998).

[388] *Martin*, 295 F.3d at 710–11 (comparing case to *Collignon*).

[389] *Id.* at 710–11.

[390] *Collignon*, 163 F.3d at 992.

[391] *Wyke v. Polk Cnty. Sch. Bd*., 129 F.3d 560, 563–64 (11th Cir. 1997).

[392] *Id*. at 564.

[393] *Id*.

[394] *Id*.

[395] *Id*. at 565.

[396] *Id*. at 569.

[397] *Id*. at 570.

[398] *Id*. (collecting cases).

[399] ECF 119 at 15–17.

[400] *See* ECF 119-7 (Raysor Aff., PA1554–PA1556) at 91–93; *see also* ECF 127 at 8.

[401] Walsh Dep. (ECF 107 at 118–36, JA116–JA134) 47:22–48:14.

[402] ECF 119-7 (Raysor Aff., PA1554–PA1556) at 92 ¶¶ 13–18. There is also a third version of events—reflected in Ms. Brookins's notes taken contemporaneously during her call with Detective Walsh and in her deposition testimony—suggesting Detective Walsh actually put Therapist Raysor on the phone with Mr. Boone. *See supra* notes 314–16 and accompanying text. But although this third version of events is relevant to fraudulent concealment, it is not relevant to the merits of the state-created danger claim, as the body camera footage establishes Mr. Boone did not speak on the phone to anyone while he stood on the bridge.

[403] "When contradictory, material facts are presented, a genuine dispute is raised and undercuts a decision for summary judgment." *Rockwell Automation, Inc. v. Radwell Int'l, Inc.*, 416 F. Supp. 3d 366, 371 (D.N.J. 2019). "However, even with a presentation of contradictory facts, there can be no genuine dispute when one party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 322–23). "When the movant has completely failed to show an essential element of its case, all other facts are immaterial." *Id.* (first citing *Celotex*, 477 U.S. at 323; then citing *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992)).

[404] *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006).

[405] *Does v. Se. Delco Sch. Dist*., 272 F. Supp. 3d 656, 682 (E.D. Pa. 2017) (alterations in original) (quoting *Bright*, 443 F.3d at 282).

---

[406] *Bright*, 443 F.3d at 282.

[407] *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006).

[408] *Id*.

[409] *Id*.

[410] *Cf. Est. of Smith v. Marasco*, 318 F.3d 497, 510 (3d Cir. 2003) (quoting *Kneipp*, 95 F.3d at 1209).

[411] *Wyke*, 129 F.3d at 570.

[412] *Sanford*, 456 F.3d at 302, 312.

[413] *Cf. Christiansen v. City of Tulsa,* 332 F.3d 1270, 1282 (10th Cir. 2003) (considering whether police officers intended to place suicidal individual at unreasonable risk of harm under state-created danger doctrine when officers told psychiatrist not to contact suicidal individual during his mental health crisis and concluding the officers "had some justification for their actions" because third-party contacts may have frustrated the negotiation efforts). No party raises a justification defense in this case nor would it affect our decision because we cannot conclude Detective Walsh's alleged decision not to allow Therapist Raysor speak to Mr. Boone created a danger.

[414] *Cf. Haberle*, 885 F.3d at 175 n.5 (emphasis added) ("A 'state-created danger' may exist where a state actor either ***creates*** a harmful situation or ***increases*** a citizen's exposure or vulnerability to an already-present danger." (citing *Bright*, 443 F.3d at 281–82)); *see also Coscia*, 659 F.3d at 41 ("So far as it appears from the complaint, when the police released the decedent they 'placed him in no worse position than that in which he would have been had they not acted at all . . . .'" (quoting *DeShaney*, 489 U.S. at 201)).

[415] It is not clear from the record exactly when the police spoke to Therapist Raysor, but Detective Walsh referenced the phone call approximately thirty minutes before Mr. Boone jumped, so the call took place sometime before then. ECF 119-2 (Pl.'s CUMF to City) ¶ 64; Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182) at 2:02:40–45.

[416] *Does v. Se. Delco Sch. Dist*., 272 F. Supp. 3d 656, 683 (E.D. Pa. 2017).

[417] *See generally* Video Exhibit 1 to ECF 107 (Body Camera Footage, JA182).

[418] ECF 119 at 17; ECF 127 at 8.

[419] *Bright*, 443 F.3d at 281.

[420] *Haberle*, 885 F.3d at 177.

[421] *United Artists Theatre Cir., Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392, 399–400 (3d Cir. 2003).

[422] For instance, we would have a closer question if Detective Walsh told **Mr. Boone** he was enjoying himself watching Mr. Boone go through this crisis.

[423] ECF 119 at 15.

[424] *Id.*

[425] *Id.*

[426] *See Est. of Ramos ex rel. DeJesus v. City of Lancaster*, 705 F. App'x 79, 83 (3d Cir. 2017) ("Because of the absence of an underlying constitutional violation, Defendants were also entitled to summary judgment on the wrongful death and survival claims (which were premised on constitutional—and not state law—grounds).").

[427] ECF 108 at 11.

[428] *Donahue v. Borough of Collingdale*, 714 F. Supp. 3d 504, 516 (E.D. Pa. 2024) (*quoting Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[429] *Donahue v. Borough of Collingdale*, 714 F. Supp. 3d 504, 517 n.20 (E.D. Pa. 2024) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 123 (1992)). We need not address the "legal grafting approach[ing] tautology" Judge Baylson discussed in *Donahue*, as we can decide this claim on the first prong alone. *Id.*